H. Rosemarie SCHMIDT, etc.,
Respondent,

v.

Kevin J. CLOTHIER, et al., Defendants,

Safeco Insurance Co., intervenor,
Appellant,

Edward Paskoff, et al., Respondents.

H. Rosemarie SCHMIDT, etc.,
Respondent,

v.

Gerald Frank HOAG, Respondent,

Linda Elizabeth Epperly, Respondent,

and

Minneapolis Special School District # 1,
intervenor, Respondent,

Safeco Insurance Co., intervenor,
Appellant.

C9–82–244, C6–82–993.

Supreme Court of Minnesota.

Sept. 23, 1983.
Rehearing Denied Nov. 16, 1983.

Arthur, Chapman & Michaelson, Lindsay G. Arthur, Jr., Minneapolis, for appellant Safeco Inc.

Hvass, Weisman & King, H. Frank J. Brixuis, Minneapolis, for respondent Schmidt.

Meshbesher, Singer & Spence, Fred Pritzker, Minneapolis, for respondent Paskoff.

James L. Haigh, Minneapolis, for respondent Gerald Hoag.

Robert V. Daly, Minneapolis, for respondent Linda Epperly.

Michael Stern, Minneapolis, for respondent Mpls. Special School Dist.

Paul E. Godlewski, Minneapolis, for amicus Minn. Trial Lawyers Ass'n.

Eric J. Magnuson, Minneapolis, for amicus Minn. Defense Lawyers Assoc.

WAHL, Justice.

These consolidated cases raise important questions of insurance law in the context of underinsurance coverage, settlements, and subrogation rights.

In the first case, Rosemarie Schmidt sued for the wrongful death of her husband, Lloyd H. Schmidt. On November 1, 1979, Mr. Schmidt was hit and killed by a truck driven by defendant Clothier and owned by Clothier's employer, defendant Furniture House of Hastings, Inc., which carried a $100,000 liability policy on the truck with St. Paul Fire and Marine Insurance Company (St. Paul Fire). St. Paul Fire offered to settle with Mrs. Schmidt for the $100,000 policy limit in exchange for a full release.

Mrs. Schmidt carried $100,000 of underinsurance coverage with appellant, Safeco Insurance Company (Safeco). Because it was clear that her damages exceeded $265,000, and thus that the liable parties were underinsured, Mrs. Schmidt notified Safeco that she intended to settle with St. Paul Fire. Safeco, in reliance on the cooperation clause in Mrs. Schmidt's policy and its claimed subrogation interest, refused to acquiesce in the settlement.

Mrs. Schmidt thereafter demanded arbitration of her underinsurance claim. Safeco refused to pay underinsured benefits to Mrs. Schmidt and refused as well to submit her claim to arbitration. After Mrs. Schmidt threatened to file a bad-faith lawsuit against it, Safeco tendered a check to Mrs. Schmidt in the amount of $100,000 but required her to agree to hold in trust for Safeco any recovery she obtained from any source and to fully release Safeco from any claim she might make.

Mrs. Schmidt, who had been without recovery from any source for the 2 years after her husband's death, then moved the Dakota County District Court for an order authorizing her to accept both the check from Safeco and the check from St. Paul Fire. The district court authorized Mrs. Schmidt to accept the $100,000 settlement offered by St. Paul Fire on behalf of itself and its insureds. Mrs. Schmidt was further authorized to execute a general release of all claims against the defendants. This portion of the order was stayed 10 days, to allow Safeco the opportunity to tender a check in the amount of $100,000 to Mrs. Schmidt to protect any subrogation interest which Safeco claimed against any of the defendants. If Safeco made such a tender, Mrs. Schmidt was ordered not to negotiate any settlement with St. Paul Fire or to sign any release. The court further ordered that within 10 days Safeco either pay its underinsured benefits of $100,000 to the plaintiff or submit the matter to arbitration. Safeco refused to pay underinsured benefits and ignored the order to arbitrate. Although the order was not appealable, we granted discretionary review.

In the second consolidated case, respondent Paskoff was injured on January 13, 1977, while a passenger in a car driven by Linda Epperly and owned by the Minneapolis Special School District No. 1, when Epperly's car collided with a car driven and owned by Gerald Hoag. Paskoff sued Hoag and Epperly. Hoag offered to settle for $22,000 out of his $25,000 liability policy, and Epperly offered $4,000 out of the school district's $300,000 policy.

Paskoff, who carried an underinsurance policy with Safeco, notified it of his intent to accept the settlement offers and sought Safeco's consent to the settlements as he was required to do under the Safeco policy. Safeco refused to consent, contending that settlement would impair its subrogation rights and that Paskoff was not entitled to underinsurance benefits until he had exhausted the limits of the defendants' liability policies.

Paskoff thereafter moved the Hennepin County District Court for an order authorizing him to execute the releases and negotiate the checks tendered to him by the defendants. The district court so ordered but, as did the court in Mrs. Schmidt's case, stayed the order 10 days to give Safeco the opportunity to exchange its check for $26,000 for the settlement drafts tendered to Paskoff in order to protect its subrogation interests. Safeco appealed from that order. Epperly eventually moved for a court order finding Paskoff in contempt for refusing to accept the settlements. The court ordered Paskoff to negotiate the settlement checks, and the defendants were thereafter released. Paskoff thus has received a recovery from the liability defendants, but Safeco has refused to process his underinsured claim.

The issues involved in these cases are (1) whether underinsurance benefits are available to the insured where the proposed settlement with the tortfeasor does not exhaust the tortfeasor's liability insurance and, if so, for what amount the underinsurer is liable, and (2) whether a general release executed as part of a settlement with the tortfeasor destroys the underinsurer's subrogation rights or precludes the insured from recovering underinsurance benefits.

These cases were briefed and argued extensively by the parties, as well as by two amici, the Minnesota Trial Lawyers Association and the Minnesota Defense Lawyers Association. All advocates have requested that we formulate a rule setting forth the rights and duties of the insured, the underinsurer, the liability insurer, and the tortfeasor.

In doing so we have kept in mind the purposes of the Minnesota no-fault automobile insurance act, Minn.Stat. §§ 65B.41–.71 (1982), which include relieving the economic hardships encountered by uncompensated accident victims, Minn.Stat. § 65B.42(1), encouraging proper medical treatment by assuring prompt payment for such treatment,

Minn.Stat. § 65B.42(3), and speeding the administration of justice and easing the burden of litigation on the courts of this state, Minn.Stat. § 65B.42(4).

The first issue raised is whether policy exhaustion clauses are enforceable. Both underinsurance policies in these cases contained an exhaustion clause which provided: "We will pay under this coverage only after the limits of liability under any applicable bodily injury liability bonds or policies have been exhausted by payment of judgments or settlements." Enforcement of this clause in Paskoff's case would deny him any underinsurance benefits because he has settled within the limits of the defendants' liability policies.

Both Safeco and the Defense Lawyer amicus, however, have taken the position before this court that underinsurance benefits should be available, despite a below-limits settlement, where the injured person's damages are greater than the liability limits of the tortfeasor.[1] They are willing to concede that the legislature intended underinsurance coverage to provide benefits in excess of the tortfeasor's liability limits and that the insured has a right to full control over the lawsuit against the tortfeasor, a control which would include the right to make the best settlement possible.

The purposes of the no-fault act, noted above, include those of easing the burden of litigation and encouraging prompt payment of claims. Enforcement of policy exhaustion clauses would produce results contrary to those purposes. It could serve to force an insured to litigate the claim to final judgment in order to exhaust the policy limits. Litigation expenses would lessen the insured's net recovery, the time involved in litigation would serve to delay payment to the insured, and the litigation itself would unnecessarily burden our court system. Where the best settlement available is less than the defendant's liability limits, the insured should not be forced to forego settlement and go to trial

---

1. Appellant also concedes that underinsurance benefits are available where any one of the multiple tortfeasors is underinsured.

in order to determine the issue of damages. The insured has the right to accept what he or she considers the best settlement available and to proceed to arbitrate the underinsurance claim for a determination of whether the damages do indeed exceed the tortfeasor's liability limits. Thus, we hold that exhaustion clauses are void as against the policies of the no-fault act. The insured may recover underinsurance benefits where the total damages sustained (as determined by either arbitration or judgment) exceed the limits of the tortfeasor's liability policy even where the insured settles with the tortfeasor for less than the liability limits.[2]

Safeco and the Defense Lawyer amicus argue that, even though the insured should not be required to exhaust the tortfeasor's liability limits, the underinsurer is liable only for those damages suffered in excess of those limits, for it is only in this amount that the tortfeasor is truly "underinsured." Respondents and the Trial Lawyers amicus counter that, in order to effectuate the statute's policy of full compensation of accident victims, the underinsurer should be required to pay that amount by which the insured's damages exceed the settlement amount, i.e., the underinsurer must pay, as underinsurance benefits, the "gap" between the defendant's liability limits and what the insured has accepted as a settlement.

■ In resolving this question we must look to the language of the statutory provision in effect when these causes of action arose, which made mandatory offers of underinsured motorist benefits coverage. That provision required carriers to offer underinsurance coverage whereby the reparation obligor agrees to pay damages the insured is legally entitled to recover on account of a motor vehicle accident but which are *uncompensated because the total damages exceed the residual bodily injury liability limit* of the owner of the other vehicle. Minn.Stat. § 65B.49, subd. 6(e) (1978) (repealed 1980). This language

makes clear that the legislature contemplated excess coverage over the liability limit that would be available when damages were uncompensated merely because the tortfeasor carried inadequate liability insurance. It does not call for underinsurance coverage when damages are uncompensated because the insured has chosen to settle with the tortfeasor for less than the liability limits.

■ We conclude that the insured cannot obtain a below-limit settlement from the tortfeasor and then recoup the "gap" from the underinsurance carrier. Practically, the insured would have no incentive to obtain the best settlement if he or she is assured of recovering the "gap" from the underinsurer. Use of underinsurance benefits in this way runs counter to the agreement of the parties. It would also place the underinsurer at an unfair disadvantage in which it had no control over the insured's right to settle but yet had to pay the difference between the settlement and the liability limits. It might also lessen the incentive of the liability carrier to make its best offer to the claimant. We hold that the underinsurer is liable only for the amount of damages suffered by the insured in excess of the liability limits of the defendant. This holding permits the underinsurance claim to be processed immediately, without regard to any eventual settlement, for the underinsurer's liability depends not on the settlement but rather on the readily ascertainable liability limit of the defendant.

■ Safeco next argues that settlement by the insured with the tortfeasor destroys its subrogation rights and therefore precludes recovery by the insured of the underinsurance benefits granted by Minn.Stat. § 65B.49, subd. 6(e). Subrogation is a limited, not absolute, right that comes into existence only after the insurer has paid benefits to its insured, a fact rec-

---

**2.** Our holding is consistent with the conclusions that Minnesota state and federal district courts have reached on this issue. *See Nelson v. U.S. Fidelity & Guaranty Co.,* U.S.Dist.Ct., Minn. 3rd Div.Civ. 3–80–368, March 20, 1981;

*Boulton v. Dairyland Insurance Co.,* Henn.Cty. Dist.Ct. No. 768522, Jan. 14, 1981; *Franke v. Allstate Insurance Co.,* Henn.Cty.Dist.Ct. No. 756530, June 23, 1980.

ognized in the statutory language.[3] 6A J. Appleman Insurance Law and Practice § 4051 at 112 (1972). Once an insurer has paid the benefits it contractually owes to its insured and gives notice thereof to the tortfeasor, a subsequent release obtained by the tortfeasor will not defeat the subrogation right but rather will be viewed as a waiver of the rule against splitting the cause of action. *Travelers Indemnity Co. v. Vaccari*, 310 Minn. 97, 245 N.W.2d 844 (1976). If the tortfeasor is released before payment by the insurer, however, no subrogation rights ever arise. *Great Northern Oil Co. v. St. Paul Fire & Marine Insurance Co.*, 291 Minn. 97, 99–100, 189 N.W.2d 404, 406–07 (1971). An underinsurer which promptly sends an underinsurance claim to arbitration and pays its insured will be protected from the effects of a settlement and release of the tortfeasor.

■ Safeco contends that destruction of its potential subrogation rights precludes recovery of underinsurance benefits by its insureds. Safeco cites *Bacich v. Homeland Insurance Co.*, 212 Minn. 375, 3 N.W.2d 665 (1942), which held that the insured's release of a tortfeasor barred recovery under his insurance policy because the release had destroyed the insurer's subrogation rights. Since *Bacich* was decided, however, the Minnesota legislature enacted the Minnesota no-fault automobile insurance act. Safeco recognizes that the policies of that act override *Bacich* and require a different result here. It is the public policy of Minnesota that injured persons should not, by virtue of having purchased underinsurance, be placed in a financial position inferior to that which they would have held had the tortfeasor been fully insured. *See Milbank Mutual Insurance Co. v. Kluver*, 302 Minn. 310, 313, 225 N.W.2d 230, 232 (1974). Thus, we hold that settlement and release of an underinsured tortfeasor does not preclude recovery of underinsurance benefits.

Respondents and the Trial Lawyers amicus take the position that subrogation rights for underinsurance benefits will never arise in the context of settlement. They argue that subrogation rights exist only when the injured person has been fully compensated and only to the extent necessary to prevent double recovery by the insured. *Id.* Since the underinsurer is in a position to prevent double recovery, they claim, subrogation will never arise when its insured settles with an underinsured tortfeasor.

■ Subrogation rights depend on "general principles of equity and the nature of the contract of insurance." *Bacich v. Homeland Insurance Co.*, 212 Minn. at 376, 3 N.W.2d at 665. In *Kluver*, the insurer was attempting to recoup benefits it had paid by obtaining the proceeds of a settlement reached by its insured with two liquor vendors who had sold liquor to the uninsured tortfeasor. We held that the insured was entitled to retain the settlement proceeds because the insurance benefits and the settlement amount together did not fully compensate her for her injuries. In that case, the equities to be balanced, the insurer's right to recoup benefits paid and the injured person's right to obtain full compensation, weighed in favor of our public policy favoring full compensation of injured persons. Clearly, in the cases before us, under the rule of *Kluver*, the underinsurer would not be able to recover underinsurance benefits from settlements obtained by its insured from liability defendants because, by definition, the injured person has not been fully compensated.

■ Safeco argues, however, that it should not be denied the right to pursue the underinsured tortfeasor for benefits it has paid. In the situation before us, the equities to be balanced are those between the underinsurer, which has paid benefits, and the underinsured tortfeasor, who has not paid for the damages he or she has caused.

---

**3.** The relevant statute, Minn.Stat. § 65B.49, subd. 6(e) (1978) (repealed 1980), provides in part: "The reparation obligor [is] subrogated *to any amounts it pays* and upon payment [has] an assignment of the judgment if any to the extent of the money it pays." (Emphasis added.)

Between these two parties, the equities balance in favor of the underinsurer. The underinsurer, however, will have this subrogation right against the tortfeasor only if it has paid underinsurance benefits prior to release of the tortfeasor. Thus, the underinsurer is entitled to notice of the tentative settlement and an opportunity to protect those potential rights by paying underinsurance benefits before release. The district court in each of the cases before us provided just this opportunity. Under the procedure set out in those orders, the underinsurer was given notice of the tentative settlement agreement and a period of time in which to assess the case. In that time it could evaluate relevant factors, such as the amount of the settlement, the amount of liability insurance remaining, if any, the amount of assets held by the tortfeasor and the likelihood of their recovery via subrogation, the total amount of the insured's damages, and the expenses and risks of litigating the insured's cause of action. If the underinsurer were to determine after assessment that recovery of underinsurance benefits it paid was unlikely (e.g., where the liability limits are exhausted or nearly so and the tortfeasor is judgment-proof), it could simply let the "grace period" expire and permit the settlement and release. It must, of course, thereafter process the underinsurance claim but would not be able to recover those payments through subrogation. *Great Northern Oil Co. v. St. Paul Fire & Marine Insurance Co.,* 291 Minn. 97, 189 N.W.2d 404.

If, on the other hand, damages were substantially more than the liability limits and the tortfeasor had substantial assets, the underinsurer could substitute its payment to the insured in an amount equal to the tentative settlement. In this situation, the underinsurer's payment would protect its subrogation rights to the extent of the payment, and the insured would receive the amount of the settlement offer in cash. The underinsurer would then have to arbitrate the underinsured claim and could, thereafter, attempt to negotiate a better settlement or could proceed to trial in the insured's name. We note again that prompt assessment, arbitration, and payment of underinsurance claims will protect the underinsurer's subrogation rights, and the underinsurer will avoid having to choose later between either acquiescing in the settlement or substituting its check for the amount of the settlement offer.

■ The district courts gave the underinsurer 10 days in which to make this assessment in cases where the underinsurer had failed to pay underinsurance benefits by the time a tentative settlement had been reached. We conclude that in the future 30 days from the written notice of the tentative settlement agreement is a more reasonable time period, and so the procedure set out in the district court orders should hereafter be modified.

■ In applying this procedure to the cases before us, we find that Safeco has, in Mrs. Schmidt's case, lost its ability to either protect its subrogation rights or to deny its liability for underinsurance benefits. The district court order gave Safeco the choice of either paying Mrs. Schmidt $100,000 in underinsurance benefits or submitting her claim to arbitration. The order compelling arbitration was not appealable under Minn. Stat. § 572.26 (1982), but Safeco refused to arbitrate the claim. We hold that Mrs. Schmidt may accept St. Paul Fire's settlement offer and execute a release of the defendants, and we order Safeco to tender its unrestricted check for $100,000 in payment of Mrs. Schmidt's claim for underinsurance benefits.

■ In Paskoff's case, the defendants have already been released. Safeco could have protected its subrogation rights by substituting its check for the checks and releases tendered by the liability insurers. It could then have arbitrated the underinsurance claim with its insured and thereafter have proceeded against the tortfeasor. It chose not to do this. Thus, we hold that Safeco must proceed to arbitration of Paskoff's underinsurance claim and is liable to pay the amount, if any, by which Paskoff's

total damages exceed the liability limits of the underinsured defendant Hoag.

The district court orders are affirmed.

TODD, Justice (concurring and dissenting).

I concur in the majority opinion except that portion which requires the injured party to obtain less than full compensation in order to expedite the total claim. That portion of the opinion is inconsistent with the rest of the opinion. The so-called "gap" arises when the liability carrier tenders less than the full amount of its coverage. The majority concludes that the injured party would have no incentive to seek maximum recovery if the underinsured carrier is responsible for all amounts due over and above the proposed settlement amount. This approach ignores the solution provided in the opinion itself and has a very bad practical effect. If allowed to stand the injured party will not be able to negotiate any reasonable settlement with the liability carrier unless willing to bear a financial loss. This is not necessary. The majority opinion provides the solution. The injured party should negotiate the best possible settlement. The offer is communicated to the underinsured carrier. If it is not satisfied, the offer should be rejected, the underinsured carrier should immediately pay the amount of the offer to the injured party, and they should immediately proceed to arbitration. This method places in the underinsured carrier the ability to manage its role in the pending claim to its best advantage without imposing any financial burden on the injured party.

AMDAHL, Chief Justice (concurring and dissenting)

I join in the concurrence and dissent of Mr. Justice Todd.

SCOTT, Justice (dissenting)

I join in the dissent of Mr. Justice Todd.

COYNE, J., took no part in the consideration or decision of this case.