William BROTON, as parent and natural guardian of John Broton, a minor, Respondent,

v.

WESTERN NATIONAL MUTUAL INSURANCE COMPANY, Appellant,

State Farm Mutual Automobile Insurance Company, Defendant.

No. CO–87–1124.

Court of Appeals of Minnesota.

Oct. 20, 1987.

Review Granted Dec. 23, 1987.

**830**

Joseph F. Chase, O'Brien, Ehrick, Wolf, Deaner & Downing, Rochester, for respondent.

James T. Martin, Gislason, Martin & Varpness, P.A., Edina, for appellant.

Heard, considered and decided by POPOVICH, C.J., and RANDALL and STONE *, JJ.

## OPINION

POPOVICH, Chief Judge.

This is a declaratory action seeking a determination of the effect of the 1985 legislative amendment to the No–Fault Automobile Insurance Act regarding underinsured motorist benefits. On cross-motions for summary judgment, the trial court ordered appellant to arbitrate respondent's claim for underinsured motorist benefits. We affirm.

* Acting as judge of the court of appeals by ap-

## FACTS

On March 31, 1986, John Bausman drove his father's car through a stop sign and struck another car. John Broton, a passenger in the Bausman car, was severely injured.

The Bausman vehicle was insured by appellant Western National Mutual Insurance Company with liability coverage of $100,000 per person and $300,000 per occurrence. The same policy also provided underinsured motorist (UIM) coverage in the amount of $100,000 per person and $300,000 per occurrence. The parties stipulated Broton's damages exceed $100,000.

In November 1986, respondent demanded appellant's payment of UIM benefits, because the liability coverage did not fully compensate John for his injuries. Appellant rejected respondent's demand because the UIM limits did not exceed the liability limits. Appellant did, however, tender a check in the amount of $100,000, representing the liability limits of the Bausman policy, and a release fully and finally settling all of respondent's claims against the Bausmans. Acceptance of the $100,000 check was expressly conditioned on execution of the release. Respondent did not cash the check, and returned it to appellant. This action followed.

## ISSUES

1. After the 1985 legislative amendment to the No–Fault Act, may an injured party receive underinsured motorist benefits when the limits of such coverage do not exceed the limits of liability coverage?

2. Has respondent been "paid" within the meaning of Minn. Stat. § 65B.49, subd. 4a (1986)?

## ANALYSIS

■ 1. Before the 1985 legislative amendment to the No-Fault Act, UIM coverage in Minnesota was "add on" coverage. UIM benefits were added to the liability benefits to the extent the insured's damages exceeded the tortfeasor's liability limits. "Difference of limits" coverage, where

pointment pursuant to Minn. Const. art. 6, § 2.

the insured only collects UIM benefits to the extent UIM limits exceed liability limits, had been rejected by the Minnesota courts. *See Holman v. All National Insurance Co.*, 288 N.W.2d 244, 250 (Minn. 1980); *Hoeschen v. South Carolina Insurance Co.*, 378 N.W.2d 796, 799 (Minn.1985).

The bill containing the amendment involved in the present dispute was originally introduced as House File No. 345. Under the bill, UIM coverage in the amount of $25,000 per person and $50,000 per occurrence was made mandatory. The bill was adopted at the regular 1985 legislative session as part of Chapter 168. In addition to establishing the maximum liability of an insurer with regard to UIM benefits, the bill also prohibited stacking of uninsured and underinsured coverages. *See* 1985 Minn. Laws. ch. 168, § 11, subds. 4, 4a.

Following the regular session, a special session was convened where proponents of stacking succeeded in amending the State Department appropriations bill which required insurers to offer insureds an election to stack uninsured and underinsured coverages. *See* 1985 Minn. Laws 1st Spec. Sess. ch. 13, § 191, subd. 4(6). Opponents of stacking sought to restore the anti-stacking provisions enacted in the regular session by amending the Semi–States appropriations bill by three provisions: (1) Minn.Stat. § 65B.49, subd. 4 was rewritten as Minn.Stat. § 65B.49, subd. 3(a), using the original anti-stacking language; *see* 1985 Minn. Laws 1st Spec. Sess. ch. 10, § 68; (2) Minn.Stat. § 65B.49 subd. 4, which had been amended by the State Department appropriations bill, was repealed; 1985 Minn. Laws 1st Spec. Sess. ch. 10, § 123, subd. 5; (3) because the order of passage of appropriations bills in a special session is unpredictable, a repealer provision provided any amendment to Minn.Stat. § 65B.49, subd. 4 enacted at that same special session was void. 1985 Minn. Laws 1st Spec. Sess. ch. 10, § 123, subd. 5. The two appropriations measures were enacted the same day without further amendments.

In *Matter of State Farm Mutual Automobile Insurance Company*, 392 N.W.2d 558 (Minn.Ct.App.1986), this court had to

determine which of the two irreconcilable provisions was effective. We concluded the intent of the legislature in the 1985 regular and special sessions was to enact the "antistacking" language contained in chapter 168 and chapter 10.

The legislative history of the anti-stacking provisions is necessary because chapter 13 contained a provision not contained in chapter 10. It was not given effect of law in *State Farm* and is relevant to the determination of the issue in this case.

Subdivision 4(8) of chapter 13, section 191, provided:

> The uninsured and underinsured motorist coverages required by this subdivision do not apply to any bodily injury until the limits of bodily injury liability policies applicable to all insured motor vehicles causing the injury have been exhausted by payment of judgments or settlements and proof of such is submitted to the insurer providing the uninsured and underinsured motorist coverages.

1985 Minn. Laws 1st Spec. Sess. ch. 13, § 191, subd. 4(8). This exhaustion requirement is *not* a part of Minn.Stat. § 65B.49 (1986).

Minn.Stat. § 65B.49, subd. 4a, the heart of the controversy here, remained as originally enacted throughout the special session. It provides:

> **Liability on underinsured motor vehicles.** With respect to underinsured motor vehicles, the maximum liability of an insurer is the lesser of the difference between the limit of underinsured motorist coverage and the *amount paid* to the insured by or for any person or organization who may be held legally liable for the bodily injury; or the amount of damages sustained but not recovered.

*Id.* (emphasis added). This requires only the *amount paid* to the injured party can be deducted from the limit of UIM coverage and there is no requirement the injured person exhaust underlying liability coverage before pursuing a UIM claim.

This interpretation is consistent with the definitions of UIM coverage and underinsured motor vehicle:

"Underinsured motorist coverage" means coverage for the protection of persons insured under that coverage who are legally entitled to recover damages for bodily injury from owners or operators of underinsured motor vehicles.

Minn.Stat. § 65B.43, subd. 19 (1986).

"Underinsured motor vehicle" means a motor vehicle or motorcycle to which a bodily injury liability policy applies at the time of the accident but its limit for bodily injury liability is less than the amount needed to compensate the insured for actual damages.

Minn.Stat. § 65B.43, subd. 17 (1986).

Appellant argues serious consequences flow from this interpretation: (1) UIM coverage, which appellant argues has always been considered an "excess reservoir" of coverage, would be transformed into the primary source of funds to which an injured party may resort; (2) claims against financially responsible motorists will not be timely presented and settled, because claimants will go to the UIM carrier first for compensation; (3) the interpretation results in a multiplicity of actions, first a claim against the UIM carrier and then against the tortfeasor; (4) the interpretation allows a claimant, having first collected UIM benefits from the UIM carrier, then to proceed against a financially responsible tortfeasor so as to destroy the UIM carrier's subrogation rights and obtain a double recovery.

These arguments are without merit. First, claimants will only be entitled to UIM benefits to the extent their damages exceed the readily identifiable limits of the tortfeasor's liability policy, up to the limits of the UIM policy. Thus, the UIM coverage will not be the "primary source of funds" to which an injured party will resort. UIM coverage will serve the purpose for which it was intended.

Second, while it is true under this interpretation claimants will go to UIM carriers first for compensation, this procedure has been described and suggested to be proper by the Minnesota Supreme Court in *Schmidt v. Clothier*, 338 N.W.2d 256 (Minn.1983). In holding the underinsurer is liable only for the amount of damages suffered by the insured in excess of the liability limits of the tortfeasor, the supreme court said:

> This holding permits the underinsurance claim to be processed immediately, without regard to any eventual settlement, for the underinsurer's liability depends not on the settlement but rather on the readily ascertainable liability limits of the defendant.

*Id.* at 261. Appellant's third concern is also addressed by the court's holding in *Schmidt.*

Fourth, insurers' subrogation rights will not be destroyed. Subrogation is a limited, not absolute, right that comes into existence only after the insurer has paid benefits to its insured. *Schmidt*, 338 N.W.2d at 261–62. An injured insured must receive full compensation before subrogation attaches. *Id.* at 262. Appellant argues Minn.Stat. § 65B.49, subd. 4a supercedes *Schmidt* and other cases which hold subrogation does not attach until an injured insured has been fully compensated. Appellant cites no authority, but rather asserts no cases interpreting the 1985 amendments have held to the contrary. There is no indication Minn.Stat. § 65B.49, subd. 4a was intended to supercede this well established rule.

Finally, the risk of double recovery is not significant because UIM benefits only come into play when the claimant's damages exceed the tortfeasor's liability limits.

 2. The parties do not disagree that had respondent cashed the $100,000 check, he would have been "paid" within the meaning of Minn.Stat. § 65B.49, subd. 4a and would not be entitled to UIM benefits. This result is consistent with our recent decision in *Thompson v. Allstate Insurance Co.*, 412 N.W.2d 386 (Minn.Ct.App. 1987), wherein the injured party had accepted a check for $30,000, which was the limit of the tortfeasor's liability policy. We held the injured party was not entitled to UIM benefits because the difference between his UIM limits and the amount paid by the tortfeasor's insurance company was zero. However, respondent returned the

check uncashed. Does the term "paid" in this case include an offer of settlement or tender of money?

Appellant argues the term "paid" clearly contemplates an offer of settlement or tender of money. Absent a statutory definition of paid to include an offer of settlement or tender of money, the plain meaning of the word must be used.

If appellant's argument were adopted, that an offer of settlement or tender of money satisfies the "paid" provision, a liability insurer could destroy an injured party's opportunity to recover UIM benefits by quickly tendering a liability check. Certainly this is not the result the legislature intended.

### DECISION

The 1985 legislative amendment to the No–Fault Act did not change UIM coverage in Minnesota to "difference of limits" coverage. An injured party whose damages exceed the tortfeasor's liability limits may recover UIM benefits even if the liability limits equal or exceed the UIM limits. Respondent was not "paid" within the meaning of Minn.Stat. § 65B.49, subd. 4a by a tender of a check for settlement, not accepted or cashed, but returned. The trial court's order the parties submit the UIM benefits claim to arbitration is affirmed.

Affirmed.