James A. ELWOOD, Appellant,

v.

**HORACE MANN INSURANCE COMPANY, Respondent.**

No. C2-94-2116.

Court of Appeals of Minnesota.

May 16, 1995.

Arlo H. Vande Vegte, Long Lake, for appellant.

William K. Strifert, Minneapolis, for respondent.

Considered and decided by KLAPHAKE, P.J., and PETERSON and MANSUR,* JJ.

## OPINION

KLAPHAKE, Judge.

Appellant James A. Elwood (Elwood) sued his insurer, respondent Horace Mann Com-

pany (Horace Mann), to compel arbitration of an underinsured motorist (UIM) claim or to declare Horace Mann "has suffered no prejudice from lack of a Schmidt–Clothier notice and/or has otherwise waived or is estopped to raise the Schmidt–Clothier issue as a defense." *See Schmidt v. Clothier,* 338 N.W.2d 256, 263 (Minn.1983). Following a trial, the court concluded Elwood forfeited his right of action against Horace Mann for UIM benefits. This appeal followed the court's denial of Elwood's posttrial motions, and its entry of judgments. We reverse.

## FACTS

On October 21, 1988, Elwood was injured in a three-car accident when his vehicle was struck twice from behind, first by a vehicle owned by Fredonia Richardson. The Richardson vehicle was pushed into Elwood's vehicle a second time when it was struck from behind by a vehicle operated by Jacqueline Gonzales and owned by Gonzales' father.

The Richardson vehicle was insured by Westfield Insurance Company, and the Gonzales vehicle was insured by Illinois Farmers Insurance Company. Both policies provided liability coverage of $30,000 per person and $60,000 per accident. Elwood was insured under a policy issued by Horace Mann, with UIM coverage in the amount of $100,000.[1]

By May 1991, Elwood had sued the tortfeasors, Richardson and Gonzales. From the beginning, Horace Mann was either actively involved or monitoring the tort case. Horace Mann's attorney, William Strifert (Strifert) was in frequent contact with Elwood's attorney, Terrance McCloskey, and had some direct contact with the tortfeasors' attorneys. Strifert received many of the documents generated by Hennepin County, including a copy of the scheduling order and notices of assignment of judges. Strifert also received copies of the pleadings, discovery, medical records,

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

1. At the time of the accident, UIM benefits were calculated by the "difference of limits" between the UIM limits and the tortfeasors' liability limits. *See Broton v. Western Nat'l Mut. Ins. Co.,*

428 N.W.2d 85, 89 (Minn.1988). If a UIM claimant settled for less than the tortfeasors' liability limits and gave adequate notice to the UIM carrier, he or she could also recover the "gap" between the settlement amount and the limits of UIM coverage. *See Schmidt v. Clothier,* 338 N.W.2d 256, 264 (Minn.1983).

and correspondence between the attorneys. Strifert was involved or present during depositions taken of Elwood and Gonzales, and received a copy of Richardson's deposition.

Since 1991, the parties discussed the possibility of a UIM claim. In a June 1991 letter to McCloskey, Strifert acknowledged Elwood's UIM claim, the identity of the tortfeasors, the liability insurers of the tortfeasors, and the liability insurance limits. In a November 1991 letter to Strifert, McCloskey demanded $40,000 to settle Elwood's UIM claim, an amount representing the difference between the tortfeasors' two $30,000 policies and the $100,000 UIM limits.

By January 1992, it was clear that Elwood intended to settle with the tortfeasors. In a letter, McCloskey informed Strifert that he expected to recover $30,000 from each of the two tortfeasors. According to McCloskey's deposition in the spring, he told Strifert he would only be getting $25,000 from Richardson's insurer and that he would give Strifert a "discount of $5,000." McCloskey further testified that he and Strifert understood that whatever Elwood settled for, Horace Mann would get "full credit for $60,000." McCloskey stated that he had told Strifert he wanted ed to wait to settle with Richardson until he reached a settlement with Gonzales because he did not want to destroy the tortfeasors' joint and severable liability.

In March 1992, McCloskey demanded arbitration of the UIM claim. The parties agreed to arbitrate a separate claim for basic economic loss benefits in the hearing for the claim for UIM benefits. Three arbitrators were selected, and a hearing was scheduled for September 2, 1992. The arbitration was postponed to November 5, 1992, and was again rescheduled to December 2, 1992.

On July 27, 1992, Horace Mann offered Elwood $25,000 to settle his claims for UIM benefits and all past and future claims for basic economic loss benefits. On September 21, McCloskey demanded $37,500, plus satisfaction of a Medicare lien and payment of all unpaid medical bills. Strifert subsequently pointed out to McCloskey his demand "is greater than Horace Mann's total exposure" because $7,360 remained in PIP benefits and

Horace Mann's exposure with regard to the UIM claim was $40,000, for a total of $47,360.

On October 2, 1992, a pretrial conference was held. Although Strifert was notified of this conference by Hennepin County, he chose not to attend. It was at this conference that Elwood agreed to settle with the tortfeasors. On October 7, Elwood released all claims against Richardson and her insurer (Westfield), and received $25,000. On October 16, he received $13,000 from Farmers (the Gonzales' insurer), and released all claims against Farmers. Ten days later, on October 26, Strifert wrote directly to the tortfeasors' attorneys and requested copies of the releases signed by Elwood.

On October 28, a handwritten note from McCloskey to Strifert mentioned that the claims against the tortfeasors had been settled "as advised they would since this spring." Strifert thereafter refused to arbitrate Elwood's UIM claim, insisting that McCloskey had failed to provide him with the notice required by *Schmidt* prior to settling with the tortfeasors.

On December 2, 1992, Elwood brought a separate no-fault action against Horace Mann for the remaining balance of his no-fault benefits, totalling $7,643. Prior to the scheduled arbitration, Elwood settled that claim against Horace Mann and signed a release.

In June 1993, Elwood brought this action against Horace Mann. On the day of trial, May 18, 1994, Elwood moved to amend his complaint to include a breach of contract claim. His proposed amendment alleged that Horace Mann breached its insurance contract when it refused to pay him medical no-fault benefits, and that it was therefore not entitled to raise the Schmidt/Clothier notice defense. The motion was denied, and the trial proceeded.

At trial, David Ettel, Horace Mann's claims manager, agreed that neither tortfeasor appeared to be a good subrogation target and that Horace Mann had developed that information "in the course of handling this UIM claim." Ettel further acknowledged that substitution of checks for either of the tortfeasor's insurance carriers was "not an

issue" and that retention of subrogation rights was not mentioned.

McCloskey's deposition testimony reiterated that both tortfeasors were poor subrogation prospects because Gonzales was a student and Richardson was unemployed and receiving social security. McCloskey further testified that he and Strifert agreed that whatever Elwood settled for, Horace Mann would get the "full credit for $60,000." McCloskey claims this understanding constituted an agreement that Elwood would assume responsibility for any gap resulting from Elwood's settlements with the tortfeasors.

The trial court made a number of findings, including that Elwood did not provide Horace Mann with written notice of the proposed settlements with the tortfeasors as required by *Schmidt*, that this lack of notice prejudiced Horace Mann, and that Horace Mann did not waive its right to this notice. The court concluded that Elwood forfeited his right of action against Horace Mann for UIM benefits, and dismissed his action. This appeal followed the court's denial of Elwood's posttrial motions for amended findings or a new trial, and for leave to amend his complaint to include a breach of contract claim.

## ISSUE

Did the trial court properly conclude that Elwood forfeited his claim for UIM benefits?

## ANALYSIS

■ A UIM carrier is entitled to 30 days' written notice from its insured of a tentative liability settlement agreement. *Schmidt v. Clothier*, 338 N.W.2d 256, 263 (Minn.1983). The purpose of this notice requirement is to give the UIM carrier an opportunity to investigate the tortfeasor's assets and determine whether its right of subrogation is of sufficient value to justify substituting its payment for that of the tortfeasor's. *Id.*

■ In *American Family Mut. Ins. Co. v. Baumann*, 459 N.W.2d 923 (Minn.1990), the supreme court held that a *Schmidt* notice should provide a UIM carrier with the following information:

1. That a settlement agreement has been reached contingent upon the UIM carrier's decision to substitute its draft.

2. The identity of the insured.

3. The identity of the tortfeasor and the tortfeasor's insurer.

4. The limits of the tortfeasor's automobile liability insurance.

5. The agreed upon amount of the settlement.

*Id.* at 927. The *Baumann* court further held:

Absent the required 30–day written notice, release of the tortfeasor shall be deemed prejudicial to the underinsurer. That presumption shall be rebuttable, but the burden of demonstrating by a preponderance of the evidence the absence of prejudice shall be borne by the insured. An insured's failure to sustain that burden of proving a lack of prejudice to the insurer shall result in forfeiture.

*Id.*

■ In reaching its conclusion that Elwood forfeited his right to UIM benefits, the trial court found that Elwood did not provide Horace Mann with notice as required by *Schmidt* and that Horace Mann was prejudiced. The court did not mention or cite *Baumann*. The court's findings must be upheld unless clearly erroneous or affected by an erroneous view of the law. *See* Minn. R.Civ.P. 52.01; *Olson v. Blue Cross & Blue Shield*, 269 N.W.2d 697, 700 (Minn.1978); *Anda Constr. Co. v. First Federal Savings & Loan Ass'n*, 349 N.W.2d 275, 277 (Minn.App. 1984), *pet. for rev. denied*, (Minn. Sept. 5, 1984).

### Notice

Elwood concedes that he did not send a formal, written *Schmidt* notice or letter to Horace Mann. Instead, he argues that Horace Mann received the equivalent or was otherwise on constructive notice of his settlements with the tortfeasors.

■ Indeed, notice may be proved by circumstantial, as well as by direct evidence. *See Industrial Loan & Thrift Corp. v. Swanson*, 223 Minn. 346, 353, 26 N.W.2d 625, 630

(1947). In addition, strict compliance with *Schmidt* is not required in every case. The supreme court has cautioned that "*Schmidt* was not intended as a technical snare for unwary insureds" and that once a UIM carrier receives a certain amount of information from other sources, it has an obligation to respond—

> if only to tell its insured that if she released the tortfeasor without giving [the carrier] 30 days' written notice of any settlement agreement she might make with [the tortfeasors], she would be deemed to have forfeited an entitlement to [UIM] benefits.

*Baumann*, 459 N.W.2d at 927; *see also Sutherland v. Allstate Ins. Co.*, 464 N.W.2d 150, 151–52 (Minn.App.1990), *pet. for rev. denied* (Minn. Mar. 15, 1991).

■ We therefore believe that the trial court clearly erred in finding that Elwood failed to provide Horace Mann with adequate notice. The evidence overwhelmingly shows that Horace Mann's attorney, Strifert, was actively involved in or monitoring the underlying tort case for over two years: Strifert received many of the papers filed in the tort case, was involved in depositions, and was in direct contact not only with McCloskey (Elwood's attorney), but also with the tortfeasors' attorneys. Through Strifert's involvement, Horace Mann knew the identities of its own insured, the tortfeasors, and the liability carriers; and it knew that the limits of the tortfeasors' liability coverages totalled $60,-000; it had sufficient time and information to investigate its subrogation prospects; and at one time it offered to settle and agreed to arbitrate Elwood's UIM claim. Moreover, Horace Mann knew that Elwood intended to settle with the tortfeasors.

While Horace Mann claims that it was not notified of the precise settlement amounts prior to the October 2, 1992 pretrial conference and asserts that it had no opportunity to substitute its drafts for the settlements, the purposes of a *Schmidt* notice have been fulfilled in this case. Horace Mann had sufficient data with which to make a reasonable inquiry and decide whether it wanted to invest money to protect its subrogation rights. Under these circumstances, Horace Mann

had an obligation to inform Elwood that a formal *Schmidt* notice was necessary prior to any settlements with the tortfeasors. *See Baumann*, 459 N.W.2d at 927. Its failure to do so should not now preclude Elwood from receiving UIM benefits.

We therefore reverse the trial court's finding that Elwood failed to provide Horace Mann with notice of the proposed settlement as required by *Schmidt.*

### *Prejudice*

■ Elwood argues that there was no prejudice because he agreed to assume responsibility for any "gap" created by his settlements with the tortfeasors. While the only evidence presented supports the existence of such an agreement, Horace Mann disputes that evidence and claims there was no agreement. Nevertheless, the fact remains that Elwood has agreed to assume responsibility for the actual $22,000 gap created by his settlements with the tortfeasors. Thus, Elwood has shown there is no actual prejudice due to his failure to settle for the tortfeasors' liability limits.

In addition, there is no evidence of prejudice because Elwood has shown that the tortfeasors were poor subrogation prospects. Elwood presented testimony from his attorney, McCloskey, and from Horace Mann's claims manager, Ettel, which established that the parties assumed that the tortfeasors were poor prospects for subrogation. Horace Mann's claims supervisor even acknowledged that substitution of checks for either of the tortfeasor insurance carriers was "not an issue" and that retention of subrogation rights was not mentioned. Thus, Elwood has shown, by a preponderance of the evidence, that Horace Mann was not prejudiced in any way by the loss of an opportunity to substitute its check.

### DECISION

We conclude that Horace Mann received adequate prior notice of Elwood's settlements with the tortfeasors because it had sufficient data with which to make a reasonable inquiry and decide whether to protect its subrogation rights. Even if Horace Mann had not received adequate notice, we con-

clude that Elwood successfully rebutted the presumption that Horace Mann was prejudiced by a preponderance of the evidence. There is no actual gap and there is no indication that Horace Mann intended or considered substituting its check.

We therefore reverse the trial court's findings that Elwood's settlement with the tortfeasors prejudiced Horace Mann and that Elwood failed to provide Horace Mann with notice. Since our reversal of these findings entitles Elwood to a judgment on the merits, we need not address the issues of waiver and estoppel. Nor need we address Elwood's challenge to the trial court's denial of his motion to amend his complaint.

**Reversed.**