**Ruth WASHINGTON, et al., Respondents,**

v.

**MILBANK INSURANCE COMPANY, petitioner, Appellant.**

**No. C2–95–2627.**

Supreme Court of Minnesota.

May 15, 1997.

---

Mahoney, Dougherty and Mahoney, P.A., Victor E. Lund, Kenneth P. Gleason, Minneapolis, for appellant.

David G. Mueller and Associates, Bradley H. Ratgen, Minneapolis, for respondents.

Meshbesher and Spence, Ltd., Michael C. Shyder, Richard A. Ruohonen, Minnesota Trial Lawyers Assn., Minneapolis, amicus curiae.

## OPINION

PAGE, Justice.

This declaratory judgment action was brought by Ruth and Booker Washington

(Washingtons) to compel Milbank Insurance Company (Milbank) to arbitrate the Washingtons' underinsured motorist (UIM) claim. The Washingtons' UIM claim arose from Mrs. Washington's involvement in a motor vehicle accident on November 11, 1989, with Junauld Presley (Presley) who was insured by State Farm Insurance Company (State Farm) with a liability coverage limit of $50,-000. Mrs. Washington was insured by Milbank under an automobile insurance policy which afforded her UIM coverage of $100,-000. At the time of the accident, Mrs. Washington was in the course and scope of her employment and, as such, her employer's workers' compensation insurer, State Fund Insurance (State Fund), paid Mrs. Washington medical and wage loss benefits pursuant to Minnesota's Workers' Compensation Act.

On May 17, 1991, the Washingtons commenced a third-party action against Presley in Hennepin County District Court, claiming damages in excess of $50,000. At a pretrial settlement conference, State Fund entered into a settlement agreement[1] with Presley and State Farm for $20,000, leaving $30,000 of liability coverage from which the Washingtons could recover. The Washingtons made an offer to settle their claims against Presley for $20,000 of the remaining $30,000 of coverage provided by State Farm. The settlement offer was accepted and the Washingtons' lawsuit against Presley was dismissed.

■ Pursuant to *Schmidt v. Clothier*, 338 N.W.2d 256 (Minn.1983), the Washingtons informed Milbank that they had reached a settlement with Presley and offered Milbank the opportunity to substitute its $20,000 draft for State Farm's draft, thereby preserving any subrogation rights Milbank had against Presley and State Farm. Milbank chose to substitute its draft for State Farm's, but insisted that the Washingtons agree that Milbank's $20,000 payment was a loan and de-

manded that the Washingtons sign a loan agreement. The terms of the agreement, captioned "Agreement Regarding Underinsured Motorist Coverage Effectuating Provisions of Schmidt v. Clothier," included the following:

1. Milbank herewith tenders to Washington the sum of $20,000.00 as a loan, subject to repayment upon the terms set out below.

2. Washington accepts the loan.

3. Washington will reject the offer of State Farm and Presley for the Naig[2] settlement above and will continue in good faith to vigorously prosecute her claim and action against Presley.

4. Washington will repay the loan only out of proceeds of recovery from State Farm and/or Presley by settlement or judgment. Repayment shall be made beginning with the first dollar of any recovery. As to this amount, it is understood and agreed that Milbank's repayment right is as creditor and not as subrogee. Interest will be paid on the loan at the judgment rate and only to the extent that Washington actually recovers prejudgment interest upon her claims against Presley.

5. If after receipt of the loan proceeds herein, Washington or her attorneys shall decline to further proceed with the action now pending against Presley, Washington agrees that Milbank may designate attorneys to be substituted to continue prosecution of the action (upon any reasonable compensation agreement to be determined by Milbank) and Washington will fully cooperate with Milbank and attorneys retained for her by it.

6. Washington retains the right to settle her claim against Presley at any time subject to *Schmidt v. Clothier* and later case law thereon.

The Washingtons signed the loan agreement and then proceeded to make a demand

---

1. The purpose of this agreement was to allow State Fund to obtain partial reimbursement of statutory subrogation rights under the Workers' Compensation Act.

2. A Naig settlement is one where settlement is given for all claims not covered by workers' compensation or not compensable under the Workers' Compensation Act. *See Naig v. Bloomington Sanitation*, 258 N.W.2d 891 (Minn.1977).

for UIM arbitration pursuant to the terms of the underinsurance provisions of their insurance policy with Milbank. Milbank declined to arbitrate, claiming that this court's decision in *Employers Mut. Cos. v. Nordstrom,* 495 N.W.2d 855 (Minn.1993), and paragraph 3 of the loan agreement, required the Washingtons "to pursue the tortfeasor to conclusion before [they are] entitled to arbitrate the UIM claim." Based on Milbank's refusal to arbitrate, the Washingtons commenced a new lawsuit against Presley alleging the same causes of action they brought in the 1991 lawsuit in an effort to satisfy the terms of the loan agreement. The district court, in *Washington v. Presley,* granted Presley's motion to dismiss based on its conclusion that:

(1) A settlement agreement was reached between the Washingtons and State Farm;

(2) Notice of settlement had been given to Milbank;

(3) Milbank had preserved its subrogation interest against Presley and State Farm;

(4) Milbank was the real party in interest in the proceedings; and

(5) The Washingtons had no further cause of action against Presley.

No. PI 95–5250 (4th Dist.Minn. May 25, 1995) (order and memorandum). That decision was appealed by the Washingtons to the court of appeals. The court of appeals, in an unpublished opinion, affirmed, holding that the district court had properly ruled that Milbank "was the real party in interest" in the action. *Washington v. Presley,* No. C2–95–2093 at 5, 1996 WL 162634 (Minn.App. April 9, 1996).

The Washingtons subsequently commenced this declaratory judgment action against Milbank. Milbank moved for an order directing the Washingtons to proceed with the tort action against Presley until they either obtained a final judgment against Presley in an amount in excess of Presley's liability insurance policy limits; or agreed to a settlement with Presley for an amount equal to Presley's liability insurance policy

limits; or reached a settlement with Presley in an amount approved by Milbank. The district court, in *Washington v. Milbank Ins. Co.,* ruled that:

(1) Milbank was entitled to pursue a tort claim after resolution of the underlying claim by substituting its draft for the settlement between the Washingtons and State Farm;

(2) The substitution created a subrogation right on behalf of Milbank;

(3) The UIM claim ripened at the time of substitution and the UIM claim must be resolved prior to the UIM insurer taking action on the subrogation claim; and,

(4) Demanding that the Washingtons proceed in the tort action after substitution would discourage settlements and would be against public policy.

No. CT 95–08503 (4th Dist.Minn. Nov. 14, 1995) (order and memorandum). The court directed the matter to immediate arbitration, and Milbank appealed. The court of appeals, in *Washington v. Milbank Ins. Co.,* 551 N.W.2d 513 (Minn.App.1996), affirmed. We granted Milbank's petition for further review and now affirm.

■ The facts before us are undisputed. When the facts of a case are not in dispute, this court applies a *de novo* standard of review to determine whether the lower courts erred in their application of the law. *Dean v. American Family Mut. Ins. Co.,* 535 N.W.2d 342, 343 (Minn.1995).

■ This case again presents the question of what is the proper procedure for an insured to follow when seeking UIM benefits from its insurance company. Milbank contends that the following three issues must be addressed in order to answer that question.

(1) Whether the substitution of drafts by an underinsurer to an underinsurance claimant is a "recovery" entitling the claimant to pursue immediate arbitration against the underinsurer for any "gap" between the tortfeasor's liability policy limits and a below-limits settlement.

(2) Whether an underinsurance claimant may determine if the liability insurer's below-limits offer is the best settlement.

(3) Whether a substitution payment made by an underinsurer is different in character from benefits payable under the UIM policy and should therefore be termed a loan, with limitations on the obligation of repayment.

The procedure for resolving a UIM claim was first announced by this court in *Schmidt v. Clothier.* 338 N.W.2d at 261 (stating that a UIM claimant may either pursue a tort claim to conclusion in district court, and then, if the judgment exceeds the liability limits of the tortfeasor's policy, pursue UIM benefits; or settle the tort action for "the best settlement," give notice to the underinsurer, and then maintain a claim for UIM benefits). The *Schmidt–Clothier* procedure has been analyzed, refined, and exhaustively discussed in a number of cases since it was originally announced. *See Gusk v. Farm Bureau Mut. Ins. Co.,* 559 N.W.2d 421 (Minn.1997) (holding that UIM insurers may not demand refund of a draft substituted pursuant to *Schmidt–Clothier* after a jury awards damages in the underlying tort action that are less than the substituted amount); *Malmin v. Minnesota Mut. Fire & Cas. Co.,* 552 N.W.2d 723 (Minn.1996) (holding that a clause requiring a UIM claimant to obtain consent to sue from the underinsurer is violative of public policy); *Employers Mut. Cos. v. Nordstrom,* 495 N.W.2d 855 (Minn.1993) (holding that a UIM claimant must pursue his or her claim against the tortfeasor to trial or settlement before seeking UIM benefits from the underinsurer, and recognizing that the underinsured may settle the underlying tort claim for the best settlement, give notice to the underinsurer pursuant to *Schmidt v. Clothier,* and then maintain a claim for underinsurance benefits); *Broton v. Western Nat. Mut. Ins. Co.,* 428 N.W.2d 85 (Minn. 1988) (concluding that the underinsurer's substitution allows the underinsurer to step into the shoes of the claimant, therefore possessing a subrogation right to maintain the claimant's tort action and recoup the amount of the substitution payment from the tortfeasor's liability insurance carrier). In each of these cases we reaffirmed the basic procedure set forth in *Schmidt v. Clothier.*

The issues raised by Milbank are premised on the novel argument that our decision in *Nordstrom* fundamentally altered the *Schmidt v. Clothier* landscape. Milbank reads *Nordstrom* as requiring that, before an insured may pursue arbitration under a UIM policy, the insured must litigate its claim with the tortfeasor to judgment in the district court or reach a settlement in the underlying action equal to or greater than the tortfeasor's liability insurance policy limits. Applying that reading of *Nordstrom* to the facts of this case, Milbank contends that because the Washingtons did not obtain a judgment or reach a settlement with Presley equal to or greater than Presley's insurance policy limits, the Washingtons cannot proceed to arbitrate their UIM claim.

In *Nordstrom,* this court stated that "denying claimants the option of proceeding first with an unmatured underinsurance claim reduces the likelihood of underinsurance becoming primary coverage, which would be contrary to the designed role of underinsurance and to the underwriting principles on which it is written." 495 N.W.2d at 858. However, in making that statement, the court specifically recognized two options that are available for insureds who want to pursue a UIM claim against their insurance company. Under option one, the insured may pursue a tort action to conclusion in district court, and then, if the judgment exceeds the liability limits, pursue a claim for underinsurance benefits. *Id.* at 857. Under option two, the insured may settle the tort claim for "the best settlement," give a *Schmidt v. Clothier* notice to the underinsurer, and then maintain a claim for underinsurance benefits. *Id.* In recognizing these two options, the court stated:

> [T]he fairest solution to our problem here is to continue to require an injured claimant to recover first from the tortfeasor's

liability insurance before proceeding to arbitrate an underinsured benefits claim. * * *

This rule avoids new complications and it is not unfair. If claimant does not choose to go to trial, [he or] she has the option of making a settlement with the tortfeasor's insurer (who must negotiate in good faith to avoid a bad faith claim), and, since *Broton* has modified *Schmidt,* claimant is not required to absorb the gap if [he or] she settles in good faith for less than the liability policy limits.

*Id.* at 858. Clearly, the basic procedure set forth in *Schmidt v. Clothier* did not change as a result of our decision in *Nordstrom. Nordstrom* merely clarified that the insured must first recover from the tortfeasor's insurance company by either pursuing the tort claim to conclusion in a district court action or by reaching a settlement in accordance with the procedures set forth in *Schmidt v. Clothier* [3] before pursuing the UIM claim. Thus, Milbank's reliance on *Nordstrom* is faulty.

■ Because we have concluded that the premise underlying the issues raised by Milbank in this appeal is faulty, and because we reaffirm the basic procedures announced by this court in *Schmidt v. Clothier,* we need not address the specific issues raised by Milbank.[4] The decision of the court of appeals is affirmed.

Affirmed.

---

3. Technically, no settlement is reached when the UIM carrier follows the *Schmidt–Clothier* procedure and substitutes its draft for that of the tortfeasor's insurance company. However, the UIM carrier's substitution operates as the equivalent of a settlement between the party claiming damages and the tortfeasor because the tortfeasor is released from further liability to the party claiming damages, but, at the same time, the UIM insurer retains a subrogation right against the tortfeasor's insurance company.

4. However, a brief comment with respect to the loan agreement Milbank required the Washingtons to sign in order to receive the draft Milbank substituted for State Farm's draft is appropriate. We view that agreement as nothing more than an exhaustion clause, the type which we held to be violative of the purposes of the no-fault act and public policy in *Schmidt v. Clothier. See* 338 N.W.2d at 260–61.