## AETNA CASUALTY & SURETY COMPANY

v.

## Michael A. FARRELL and Jane L. Farrell,

### Appeal of Jane L. FARRELL.

No. 88–5125.

United States Court of Appeals, Third Circuit.

Submitted Pursuant to Rule 12(b)(6) July 12, 1988.

Decided Aug. 31, 1988.

Marvin Beshore, Luther E. Milspaw, Jr., Milspaw & Beshore, Harrisburg, Pa., for appellant.

Kevin E. Osborne, Thomas & Thomas, Harrisburg, Pa., for appellee.

Before SLOVITER, SCIRICA, and WEIS, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

As a condition for the payment of underinsured motorist coverage benefits, defendant in this declaratory judgment action was required by the plaintiff carrier to exhaust the limits of the liability policy covering the driver responsible for the injuries. Because the costs of a structured settlement defendant had negotiated with the tortfeasor's insurance company were somewhat lower than its policy limits, the district court concluded that the exhaustion prerequisite had not been met. Therefore, recovery under the underinsured motorist provision was denied. A state appellate court in the relevant jurisdiction later expressed a contrary view compelling us to vacate and remand for further proceedings.

On July 2, 1982, near Harrisburg, Pennsylvania, Mrs. Farrell suffered serious injuries when an oncoming automobile driven by John J. Brennan crossed the center line and struck the car in which she was a passenger. Brennan's liability was clear. At the time of the accident, his blood alcohol level showed intoxication caused by several hours of drinking at a local bar. Brennan was a permissive user of a car that the Allstate Insurance Company insured under a policy with personal injury limits of $100,-000/$300,000.

Mrs. Farrell brought suit against Brennan in the United States District Court for the Middle District of Pennsylvania. In November 1983, Allstate agreed to a structured settlement requiring periodic payments to Mrs. Farrell for twenty years and an immediate lump-sum payment for her attorney's fees. The total payments would amount to $187,500. Allstate's total expense for the settlement, including its purchase of an annuity to fund the future installments, was $91,090.00. In negotiating the claim against Brennan, Allstate had refused to reveal the costs of the structured settlement [1] and did not disclose that information until the present litigation was underway.

While they were residents in New Jersey, Jane Farrell and her husband, Michael, had purchased the Aetna automobile insurance policy in force on the day of the accident. An endorsement provided for payments to the Farrells in the event of injury by an underinsured driver. The policy defined an underinsured driver as one whose liability coverage is less than the limits listed in the "underinsured driver" endorsement. Brennan was an underinsured driver because his $100,000 Allstate policy liability limit was lower than the $200,000 listed in the Farrells' policy with Aetna.

The Aetna endorsement contained the following language:

"The company shall not be obligated to make any payment because of bodily injury ... to which this insurance applies and which arises out of the ... use of an underinsured highway vehicle until after the limits of liability under all bodily injury ... and liability bonds or insurance policies respectively applicable at

---

**1.** That information was discoverable under Fed. R.Civ.P. 26(b)(2).

the time of the accident ... have been exhausted by payment of judgments or settlements."

The Aetna policy also stated that "[t]his insurance does not apply ... to bodily injury ... with respect to which the insured ... shall, without written consent of the company, make any settlement with any person or organization who may be legally liable therefor."

During negotiations with Allstate, Mrs. Farrell's husband requested their attorney, Patrick T. Sullivan, to advise Aetna of the status of the discussions. Farrell wanted to "make sure Sullivan was covering all the bases," but neither the lawyer nor the Farrells informed Aetna about the settlement until six weeks after a general release was signed.[2]

Aetna knew about the accident because it had paid various medical bills covered by its policy. Its first notification of the settlement with Allstate, however, came in a letter from Michael Farrell dated January 9, 1984. In that letter, Farrell submitted a claim for his wife's injuries to the extent that they had not been fully compensated by her settlement with Allstate. Aetna ultimately refused to pay on the grounds that it had not been notified before settlement and that Allstate's limits of liability had not been exhausted.[3]

Aetna then commenced this declaratory judgment action. After the parties submitted a stipulation of undisputed facts, the district court found in favor of Aetna. The court rejected the contention that, because the structured settlement projected a pay-out of more than $100,000, Allstate's limits of liability had been exceeded. On the contrary, the court concluded that the settlement's actual cost of $91,090.00 left $8,910.00 remaining and, consequently, Jane Farrell had not exhausted Allstate's $100,000 limits. Because she had failed to meet a condition precedent to recovery under Aetna's underinsured endorsement, Mrs. Farrell could not recover.

On appeal, Jane Farrell asserts: (1) Aetna's policy was ambiguous; (2) the requirement that tortfeasor liability limits be exhausted amounts to a set-off, not a condition precedent; and (3) the exhaustion clause violates New Jersey public policy. Aetna insists that the policy language is clear and unambiguous.

## I.

When the Farrells purchased their insurance coverage, they lived in Clifton, New Jersey where the policy was delivered. We look, therefore, to the law of that state in determining the effect to be given the language in the endorsement. Were the matter open to discussion, we would be inclined to agree with the district court's reading of the policy. Although, in operation, the contractual language would produce certain undesirable consequences, it is nonetheless clear and understandable.

This is, however, a diversity case in which our role as a federal court is to predict what the Supreme Court of New Jersey would decide if confronted by the same set of circumstances. *Adams v. Madison Realty & Dev't, Inc.*, 853 F.2d 163, 168 (3d Cir.1988); *Cooper Laboratories, Inc. v. International Surplus Lines Ins. Co.*, 802 F.2d 667, 672 (3d Cir.1986). That court has not spoken to the issue presented here, but the state's intermediate appellate court, the New Jersey Superior Court, has discussed the problem in an opinion filed after the District Court entered judgment in the case now before us. *See Longworth v. Van Houten*, 223 N.J.Super. 174, 538 A.2d 414 (App.Div.1988).

In the absence of an authoritative pronouncement by a state's highest court, we may give serious consideration to the opinion of an intermediate appellate court.

---

2. Other individuals also sustained injuries in the accident, but they settled their claims with Allstate in amounts that did not affect the limits available to settle Mrs. Farrell's claim. Michael Farrell settled his own personal injury claim and apparently his derivative claim for the loss of his wife's consortium as well.

3. The Farrells have filed a malpractice action against Mr. Sullivan because of his failure to notify Aetna.

*Commercial Union Ins. Co. v. Bituminous Casualty Corp.,* 851 F.2d 98, 100 (3d Cir.1988); *Aloe Coal Co. v. Clark Equipment Co.,* 816 F.2d 110, 117 (3d Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 156, 98 L.Ed.2d 111 (1987); *Wilson v. Asten–Hill Mfg. Co.,* 791 F.2d 30, 32 (3d Cir.1986). Therefore, we look to that source for an indication of how the state Supreme Court would likely decide the question presented here.

In *Longworth,* the Superior Court construed similar underinsured endorsements. The factual situation may be distinguished in some respects from the facts here; nevertheless, the broad and wide-ranging discussion of underinsured motorist coverage is pertinent to the issues before us. The New Jersey opinion applied to two distinct occurrences. In both situations, the carrier providing underinsured coverage had been notified before settlement, but in the interest of protecting its subrogation rights, it had refused to allow its insured, the victim, to sign a general release in favor of the tortfeasor—even though the company insuring him had tendered its full liability coverage.

The Superior Court held that the subrogation and consent-to-settle clauses in the underinsured motorist endorsement contravene public policy because they "dramatically impede effectuation of the legislative design in providing for [underinsured motorist] coverage and because they so impinge on the insured's right to manage and dispose of his prerequisite claim against the tortfeasor." *Longworth,* 538 A.2d at 420. The court agreed with the trial judge that, by working in tandem, the two clauses increased, rather than decreased, litigation and chilled efforts at settlement, a result at odds with New Jersey public policy.

Although the exhaustion clause was not directly at issue, the Superior Court discussed its effect because of "its inextricable entanglement" with the subrogation problem. *Id.* at 423. In the court's view, the exhaustion clause "requires that the insured settle with or obtain judgment against the tortfeasor in the full amount of the tortfeasor's own liability coverage before the [underinsured endorsement] carrier has any payment obligation at all...." *Id.* In that scenario, the victim may not choose to accept a compromise from the tortfeasor's carrier even if it is minimally less than the full amount available. It may be seen that the tortfeasor's carrier, by refusing to pay the full amount of the liability coverage, can force the accident case to trial with possibly adverse consequences to the victim. The end result of litigating the accident claim could be to reduce the victim's net recovery, delay payment, and unnecessarily burden the state court system.

The New Jersey court agreed with the construction of a similar clause in *Schmidt v. Clothier,* 338 N.W.2d 256 (Minn.1983). In that case, the Minnesota Supreme Court declared that victims have the right to accept what they consider "the best settlement available" from the tortfeasor and then to "arbitrate the underinsurance claim for a determination of whether the damages do indeed exceed the tortfeasor's liability limits." *Id.* at 261.

The Superior Court acknowledged that the New Jersey Automobile Freedom of Choice and Costs Containment Act of 1984, N.J.S.A. 17:28–1.1(e), used exhaustion terminology in speaking of underinsured motorist coverage. The court concluded, however, that the statute's wording is "in definitional terms rather than in the circumscription of the insured's substantive right" against the underinsured endorsement carrier. *Longworth,* 538 A.2d at 423.

The court read the Act as intending only to require "deduction of the tortfeasor's full available policy limit, whether or not that limit is actually paid to the victim." *Id.* at 424. "If the victim does accept less than the tortfeasor's policy limits, his recovery against his [underinsured endorsement] carrier must nevertheless be based on a deduction of the full policy limits" available to the tortfeasor. *Id.* at 423. Under the New Jersey approach, although the victim need not take every last cent of the tortfeasor's coverage, the underinsured endorsement carrier is entitled to credit for

the total liability limits as if they actually had been exhausted.

On its face, the *Longworth* opinion appears to govern the result in this case despite apparent weaknesses in the Superior Court's approach. The discussion of exhaustion clauses is dictum, even though inseparable from the court's analysis of the subrogation and settlement clauses. In the case at hand, moreover the underinsured endorsement and the accident predated January 1, 1984, when the New Jersey Automobile Freedom of Choice Act took effect. Although the same chronology was present in the *Longworth* litigation, the Superior Court adverted to it only in a footnote and did not elaborate further on its significance. To our view, the chronological sequence undermines any contention that the endorsement was drafted to comply with legislative intent because the statute in question was not enacted until after the policy had been delivered to the Farrells.

However, the Superior Court did not rely solely on the 1984 Act when it determined New Jersey's public policy. It turned also to *Ciecka v. Transamerica Ins. Group,* 81 N.J. 421, 409 A.2d 272 (1979), where the state Supreme Court had expressed its commitment to liberal construction of legislation regulating automobile insurance. In addition, the Superior Court cited *Riccio v. Prudential Property & Casualty Ins. Co.,* 108 N.J. 493, 531 A.2d 717 (1987), referring to the "legislative purpose of providing maximum and expeditious protection to the innocent victims of financially irresponsible motorists" underlying the early enactment of provisions applicable to uninsured motorist coverage—a concern "no less applicable" to underinsured motorist coverage. *Longworth,* 538 A.2d at 419. *See also Amiano v. Ohio Casualty Ins. Co.,* 85 N.J. 85, 424 A.2d 1179 (1981); *Motor Club of America Ins. Co. v. Phillips,* 66 N.J. 277, 330 A.2d 360 (1974); *Fellippello v. Allstate Ins. Co.,* 172 N.J.Super. 249, 411 A.2d 1137 (App.Div.1979), *certif. denied,* 85 N.J. 481, 427 A.2d 574 (1980).

We agree with the *Longworth* court that prohibiting a victim from negotiating a set-tlement with a tortfeasor's insurance carrier for anything less than the maximum limits of liability is likely to foment unnecessary and undesirable litigation. Furthermore, we do not perceive how, in most cases, underinsured endorsement carriers actually will be prejudiced if they receive credit for the full limits of the tortfeasors' policy. Of course, a different question is presented when, in addition to insurance coverage, the tortfeasors have other resources which might be used to satisfy the subrogation claims of underinsured endorsement carriers.

The New Jersey Superior Court commented that "it is not our function to rewrite contracts of insurance." *Longworth,* 538 A.2d at 424. Although the insurance carriers may assert with some justification that the New Jersey appellate court did exactly that, it is not our function as a federal court sitting in diversity to second guess a state court's pronouncement on the public policy within its jurisdiction.

We believe that the *Longworth* opinion represents a reasonable prediction of the rationale the state Supreme Court would adopt, and we therefore feel obliged to accept that construction of the underinsured endorsement as proper under New Jersey law. Consequently, we must vacate the judgment of the district court, which rested entirely on the premise that Aetna's coverage did not apply because Allstate's limits had not been exhausted. A caveat applies. If Mrs. Farrell ultimately is found to be entitled to recover under the underinsured motorist coverage, she will be required to give credit to Aetna for Allstate's $100,000 limits.

## II.

The notice question remains for the district court. In *Longworth,* notice had been given but the carrier had frustrated the victim's attempts to settle with the tortfeasor. Here, Aetna was not aware of the settlement discussions and did nothing to interfere with Mrs. Farrell's claim against Brennan. Moreover, the parties in this case have stipulated that Brennan is judgment-proof.

At first blush, these circumstances fail to show that Aetna suffered any real prejudice. *Cooper v. Government Employees Ins. Co.*, 51 N.J. 86, 237 A.2d 870 (1968) (burden on insurer to show prejudice from lack of notice); *Casey v. Selected Risks Ins. Co.*, 176 N.J.Super. 22, 422 A.2d 83 (App.Div.1980). Because of the narrow thrust of this appeal, however, the parties did not brief this phase of the controversy, and the district court did not pass on it. Therefore, we consider it only appropriate that this issue and any others made relevant by *Longworth* should be addressed in the first instance by the district court.

The judgment of the district court will be vacated, and the case will be remanded for further proceedings consistent with this opinion.