ARLYN W. PLOEN, APPELLANT, V.
UNION INSURANCE COMPANY, APPELLEE.
ARLYN W. PLOEN, APPELLANT, V. UNION INSURANCE COMPANY
AND SHELTER MUTUAL INSURANCE COMPANY, APPELLEES.

573 N.W.2d 436

Filed January 30, 1998.    Nos. S-96-453, S-96-454.

William G. Line for appellant.

David L. Welch and Michael C. Pallesen, of Gaines, Mullen, Pansing & Hogan, for appellee Union Insurance Co.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

WRIGHT, J.
Arlyn W. Ploen commenced two actions for declaratory judgment in the district court for Dodge County, one against Union Insurance Company (Union) and the other against Union and Shelter Mutual Insurance Company (Shelter). On April 23, 1996, the district court sustained Union's motion for summary judgment and overruled Ploen's cross-motion for summary judgment. On the same date, the court sustained the motions for summary judgment of Union and Shelter and overruled Ploen's cross-motion for summary judgment. Ploen appeals, and the cases have been consolidated for purposes of appeal.

## SCOPE OF REVIEW
Whether a statute is constitutional is a question of law; accordingly, the Nebraska Supreme Court is obligated to reach a conclusion independent of the decision reached by the court below. *State v. Severin*, 250 Neb. 841, 553 N.W.2d 452 (1996); *Kuchar v. Krings*, 248 Neb. 995, 540 N.W.2d 582 (1995).

The interpretation and construction of an insurance contract or policy involve questions of law, in connection with which an appellate court has an obligation to reach its conclusions independent of the determinations made by the court below. *Kast v. American-Amicable Life Ins. Co.*, 251 Neb. 698, 559 N.W.2d 460 (1997).

In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Kramer v. Kramer*, 252 Neb. 526, 567 N.W.2d 100 (1997).

## FACTS

On December 24, 1991, Ploen was a passenger in a car owned and operated by his father. The car was hit from behind by a car driven by Karen Keller, and Ploen allegedly suffered back injuries as a result of the accident. Ploen sued Keller, who admitted liability, and the parties eventually settled for $54,000 of Keller's policy liability limit of $100,000. However, Ploen alleges that his damages total at least $250,000.

Ploen was covered by his father's policy with Union for $5,000 in medical payments and $25,000 in underinsured motorist benefits. He was also covered by his own policy with Shelter for $25,000 in medical payments and $100,000 in underinsured motorist benefits. Ploen alleges that as a result of the accident, he incurred medical expenses in the amount of at least $50,364. Union paid to or on behalf of Ploen $5,000 in medical payments, and Shelter paid $25,000 to Ploen for medical payments.

Prior to his settlement with Keller, Ploen requested that Union and Shelter give their consent to the proposed settlement agreement and requested that Union and Shelter waive their subrogation interests. Both companies denied such requests on the basis that Ploen should not settle for less than Keller's policy limit if his damages were indeed $250,000.

Thereafter, Ploen filed petitions for declaratory judgment against Union and Shelter. In its answer denying liability for underinsured coverage and asserting subrogation rights, Union relied on its contractual provision stating that recovery will be

had only after "the limits of liability under any applicable bodily injury liability bonds or policies have been exhausted by payment of judgments or settlements." Shelter relied on its contractual provision stating that it was obligated to pay only such damages as "are in excess of the total limits of all bodily injury liability insurance policies and bonds applicable to the person or persons legally responsible for such damages and available to cover the **insured's** damages." Union and Shelter also asserted that Ploen had breached the insurance contracts by settling without their written consent.

Union and Shelter each moved for summary judgment, and Ploen filed cross-motions for summary judgment. The district court sustained Union's and Shelter's motions for summary judgment, overruled Ploen's cross-motions for summary judgment, and dismissed the lawsuits. In so doing, the court specifically found that Neb. Rev. Stat. § 44-3,128.01 (Reissue 1993), a statute providing for subrogation of medical payments, is constitutional. Ploen timely appealed the orders granting summary judgments to Union and Shelter and overruling his cross-motions for summary judgment.

## ASSIGNMENTS OF ERROR

Ploen makes the following assignments of error: (1) The district court erred in finding that Ploen's settlement with Keller adversely affected Union and Shelter, (2) the court erred in finding that § 44-3,128.01 is constitutional, and (3) the court erred in sustaining Union's and Shelter's motions for summary judgment and overruling Ploen's cross-motions for summary judgment.

## ANALYSIS

### SUBROGATION FOR MEDICAL PAYMENTS

We first address whether Union and Shelter are able to subrogate for the medical payments made to or on behalf of Ploen. In support of their right to subrogate, Union and Shelter rely on § 44-3,128.01, which provides:

A provision in an automobile liability policy or endorsement which is effective in this state and which grants the insurer the right of subrogation for payment of

benefits under the medical payments coverage portion of the policy shall be valid and enforceable, except that if the claimant receives less than actual economic loss from all parties liable for the bodily injuries, subrogation of medical payments shall be allowed in the same proportion that the medical expenses bear to the total economic loss. For purposes of this section, it shall be conclusively presumed that any settlement or judgment which is less than the policy limits of any applicable liability insurance coverage constitutes complete recovery of actual economic loss.

In *Shelter Ins. Cos. v. Frohlich*, 243 Neb. 111, 122, 498 N.W.2d 74, 81 (1993), we explained that "in the absence of a valid contractual provision or statute to the contrary, an insurer may exercise its right of subrogation only when the insured has obtained an amount that exceeds the insured's loss." Therefore, if § 44-3,128.01 is invalid, a question of material fact would exist as to whether Ploen had obtained an amount that exceeded his loss, and Union and Shelter would not be entitled to summary judgments on this issue.

Ploen argues that § 44-3,128.01 violates due process by creating an irrebuttable presumption that settlement for less than the tort-feasor's coverage equals full recovery. In *Elliott v. Ehrlich*, 203 Neb. 790, 797-98, 280 N.W.2d 637, 642 (1979), we stated that "[s]tatutes creating a permanent irrebuttable presumption have long been disfavored under the Due Process Clauses of the Fifth and Fourteenth Amendments." We held that a regulatory provision by the Nebraska Department of Public Welfare which stated that the responsibility of parents for pregnant minors included responsibility for unborn children, insofar as it created an irrebuttable presumption that the maternal grandparent actually contributes all the income required for the needs of the unborn child, was unconstitutional. We recognized that welfare benefits are a matter of statutory entitlement for persons qualified to receive them and that their termination involves state action that adjudicates important rights. We thus held that "[t]he state's interest in administrative ease and certainty cannot save the conclusive presumption of the regulation from invalidity under the Due Process Clause where there are other reasonable and practicable means of establishing the per-

tinent facts of actual contribution." *Elliott*, 203 Neb. at 798, 280 N.W.2d at 642.

In contrast to *Elliott*, in *Haven Home, Inc. v. Department of Pub. Welfare*, 216 Neb. 731, 346 N.W.2d 225 (1984), the appellant contended that a provision of the Social Security Act created an irrebuttable presumption that nursing homes which are not at least 85 percent occupied (or 50 percent in the case of new construction) are inefficient and uneconomical. We explained that social welfare legislation and regulation are treated differently:

> Classifications are upheld where no constitutionally protected right of status is significantly impaired, and where the classification bears a rational relationship to a legitimate legislative goal. In such cases classifications to avoid administrative difficulty of individual determinations in every case are proper, even though the classifications adopted are neither necessary nor universally true.

*Id.* at 735-36, 346 N.W.2d at 229, citing *Weinberger v. Salfi*, 422 U.S. 749, 95 S. Ct. 2457, 45 L. Ed. 2d 522 (1975).

In *Weinberger*, the Court upheld an irrebuttable presumption for purposes of Social Security benefits that any marriage not preceding a wage earner's death by at least 9 months was a sham. *Weinberger* illustrates the distinction between *Haven Home, Inc.* and *Elliott*. In *Weinberger*, the Court distinguished cases regarding legislative decisions regulating the private sector of the economy and public treasury from cases involving constitutionally protected rights such as the right to conceive and raise one's children, residency, or the freedom of personal choice in matters of marriage and family life.

In cases involving constitutionally protected rights, a challenged irrebuttable presumption under the 5th Amendment Due Process Clause must meet the applicable 14th Amendment standard. In contrast, other irrebuttable classifications need meet only the standard of legislative reasonableness. See *Weinberger v. Salfi, supra*. Under the standard of legislative reasonableness, the Legislature's action is sufficient if it is rationally based and free from invidious discrimination. See, *State v. Garber*, 249 Neb. 648, 545 N.W.2d 75 (1996); *Otto v. Hahn*, 209 Neb. 114, 306 N.W.2d 587 (1981).

The right to settle with a tort-feasor for less than the tort-feasor's policy limit without one's insurer's consent does not approach a constitutionally recognizable right, and Ploen does not make such a contention. Therefore, we consider whether the irrebuttable presumption found in § 44-3,128.01 is rationally based and free from invidious discrimination. See *Dandridge v. Williams*, 397 U.S. 471, 90 S. Ct. 1153, 25 L. Ed. 2d 491 (1970). In enacting § 44-3,128.01, the Legislature reached a compromise between the concern that persons injured be fully compensated in spite of subrogation clauses attempting to receive a portion of a limited recovery and the concern that insureds not be able to obtain a double recovery at the expense of insurers. There is no evidence that the statute is discriminatory.

Whether a statute is constitutional is a question of law; accordingly, the Nebraska Supreme Court is obligated to reach a conclusion independent of the decision reached by the court below. *State v. Severin*, 250 Neb. 841, 553 N.W.2d 452 (1996); *Kuchar v. Krings*, 248 Neb. 995, 540 N.W.2d 582 (1995). We conclude that § 44-3,128.01 meets the standard of legislative reasonableness and is therefore constitutional and enforceable by Union and Shelter as to their right of subrogation for medical payments.

### LIABILITY FOR UNDERINSURED BENEFITS

Next, we address whether Ploen is entitled to underinsured benefits from either Union or Shelter. Ploen argues that since he seeks only the difference between the policy limit and his damages, his settlement with the tort-feasor for less than the policy limit did not adversely affect Union's or Shelter's rights. In *Horace Mann Cos. v. Pinaire*, 248 Neb. 640, 538 N.W.2d 168 (1995), we stated that under the terms of the Underinsured Motorist Insurance Coverage Act, an insurer could avoid its policy obligation only if the insured's settlement with the tort-feasor adversely affected the insurer's rights. Neb. Rev. Stat. § 60-582 (Reissue 1993), which was in effect at the time of the accident, provided that the underinsured motorist coverages shall not apply where the insured settles without the insurer's consent if such settlement adversely affects the rights of the insurer.

We first consider Ploen's policy with Shelter. Shelter failed to file a brief in this court. The only indication that Shelter may have been adversely affected by Ploen's settlement was Union's assertion at oral argument, allegedly on Shelter's behalf, that the policy with Shelter contained a clause prohibiting the insured from settling with a tort-feasor for less than the tort-feasor's policy liability limit. Shelter's policy contained a provision which stated:

> [T]he limits of liability of this coverage shall be reduced by the total limits of all bodily injury liability insurance policies and bonds applicable to the person or persons legally responsible for such damages. **Our** obligation hereunder shall apply only to such damages as are in excess of the total limits of all bodily injury liability insurance policies and bonds applicable to the person or persons legally responsible for such damages and available to cover the **insured's** damages.

Interpretation and construction of an insurance contract or policy involve questions of law, in connection with which an appellate court has an obligation to reach its conclusions independent of the determinations made by the court below. *Kast v. American-Amicable Life Ins. Co.*, 251 Neb. 698, 559 N.W.2d 460 (1997). When the terms of an insurance contract are clear, the court may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning as an ordinary or reasonable person would understand them. In such a case, the court shall seek to ascertain the intention of the parties from the plain meaning of the policy. *Id.*

We conclude that Shelter's policy does not require that the insured must exhaust the tort-feasor's liability policy in order to assert a claim for underinsured motorist benefits. We do not address whether Shelter may have been adversely affected by Ploen's settlement with the tort-feasor.

Having determined that the policy does not preclude Ploen from settling for less than the tort-feasor's policy limit, we conclude that a material question of fact exists as to whether Ploen can recover under the provisions of Shelter's underinsured motorist policy and that the district court erred in granting summary judgment to Shelter.

We next address Ploen's contention that he is entitled to summary judgment on his cross-motion because the amount of his damages is undisputed. In arguing that his damages are undisputed, Ploen relies on Union's and Shelter's failure to controvert his affidavit which stated that his damages were in excess of $250,000. Ploen's affidavit sets forth an opinion as to the amount of damages, but it does not establish damages as a matter of law. Statements in affidavits as to opinion, belief, or conclusions of law are of no effect. *Whalen v. U S West Communications, ante* p. 334, 570 N.W.2d 531 (1997). The court properly overruled Ploen's cross-motions for summary judgment, because a question of fact exists as to the nature and extent of Ploen's injuries and the amount of his damages sustained as a result of such injuries.

We next address Ploen's policy with Union, which stated: "We will pay under this coverage only after the limits of liability under any applicable bodily injury liability bonds or policies have been exhausted by payment of judgments or settlements." Ploen argues that despite this clear language, the provision in question is void as against public policy.

Some courts have held similar provisions to be against public policy. In *Schmidt v. Clothier*, 338 N.W.2d 256 (Minn. 1983), for example, the court held that automobile insurance policy provisions requiring an insured to exhaust the tortfeasor's liability limits before underinsured benefits are available were void as against public policy of the no-fault automobile insurance act. The court explained:

> The purposes of the no-fault act . . . include those of easing the burden of litigation and encouraging prompt payment of claims. Enforcement of policy exhaustion clauses would produce results contrary to those purposes. It could serve to force an insured to litigate the claim to final judgment in order to exhaust the policy limits. Litigation expenses would lessen the insured's net recovery, the time involved in litigation would serve to delay payment to the insured, and the litigation itself would unnecessarily burden our court system. Where the best settlement available is less than the defendant's liability limits, the insured should not be forced to forego [sic] settle-

> ment and go to trial in order to determine the issue of damages. The insured has the right to accept what he or she considers the best settlement available and to proceed to arbitrate the underinsurance claim for a determination of whether the damages do indeed exceed the tortfeasor's liability limits.

*Id.* at 260-61. See, also, *Shaw v. Continental Ins. Co.*, 108 Nev. 928, 840 P.2d 592 (1992).

In contrast, at least one court has held under a provision similar to the one found in Union's policy that the insured's failure to exhaust the limits of the tort-feasor's liability policy precluded the insured from recovering underinsured motorist benefits. See *Ciarelli v. Commercial Union Ins. Cos.*, 234 Conn. 807, 663 A.2d 377 (1995).

The parties to an insurance contract may make the contract in any legal form they desire, and in the absence of statutory provisions to the contrary, insurance companies have the same right as individuals to limit their liability and to impose whatever restrictions and conditions they please upon their obligations, not inconsistent with public policy. *Safeco Ins. Co. of America v. Husker Aviation, Inc.*, 211 Neb. 21, 317 N.W.2d 745 (1982); *Lonsdale v. Union Ins. Co.*, 167 Neb. 56, 91 N.W.2d 245 (1958). From our review of the Uninsured and Underinsured Motorist Insurance Coverage Act, Neb. Rev. Stat. § 44-6401 et seq. (Cum. Supp. 1996 & Supp. 1997), previously codified as the Underinsured Motorist Insurance Coverage Act, Neb. Rev. Stat. § 60-571 et seq. (Reissue 1993), we conclude that Union's underinsured motorist coverage is consistent with the requirements of the act and is not contrary to the law. Having made this conclusion, we consider Union's provision to determine whether or not it is contrary to public policy.

Public policy is that principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public or against the public good, the principles under which the freedom of contract or private dealings are restricted by law for the good of the community. *Southern Neb. Rural P.P. Dist. v. Nebraska Electric*, 249 Neb. 913, 546 N.W.2d 315 (1996); *New Light Co. v. Wells Fargo Alarm Servs.*, 247 Neb. 57, 525 N.W.2d 25 (1994). The determination of whether a con-

tract violates public policy presents a question of law. *Jasper v. Smith*, 540 N.W.2d 399 (S.D. 1995).

Uninsured motorist coverage laws were enacted for the benefit of innocent victims of financially irresponsible motorists. See *Lane v. State Farm Mut. Automobile Ins. Co.*, 209 Neb. 396, 308 N.W.2d 503 (1981). Underinsured motorist coverage indemnifies an insured when a tort-feasor's insurance coverage is inadequate. Union's policy provides that it will pay underinsured motorist benefits "only after the limits of liability under any applicable bodily injury liability bonds or policies have been exhausted . . . ." On the basis of the facts applicable to the policy in issue, we conclude that Union's restriction is plain and unambiguous, should be enforced according to its terms, and is not contrary to public policy.

While noting the concern that a provision such as Union's might encourage an insured to litigate against the tort-feasor rather than settle, we also note the insurer's concern that the insured settle with the tort-feasor for the maximum amount possible before the insured is allowed to seek underinsured benefits. We believe that such a determination with regard to public policy is better left to the wisdom of the Legislature. Since Union's policy is valid and enforceable as to its underinsured motorist coverage, we do not consider whether Ploen's settlement with the tort-feasor adversely affected Union's rights under the policy. We therefore affirm the judgment of the district court granting summary judgment to Union.

## CONCLUSION

The summary judgment in favor of Shelter is reversed on the issue of underinsured benefits, and the cause is remanded for further proceedings. The summary judgment in favor of Union is affirmed.

AFFIRMED IN PART, AND IN PART REVERSED AND
REMANDED FOR FURTHER PROCEEDINGS.

WHITE, C.J., concurring in part, and in part dissenting.

The majority determined Shelter's provision was not an exhaustion clause and Union's exhaustion clause was consistent with public policy. I concur because the majority correctly

determined Shelter's policy was not an exhaustion clause, but it failed to address the ambiguity of the provision. However, I also dissent because the majority failed to identify the ambiguity in Union's exhaustion clause, failed to construe the provision against Union, and failed to determine the exhaustion clause was void as against public policy.

Shelter's underinsured motorist policy provides:

> [T]he limits of liability of this coverage shall be reduced by the total limits of all bodily injury liability insurance policies and bonds applicable to the person or persons legally responsible for such damages. **Our** obligation hereunder shall apply only to such damages as are in excess of the total limits of all bodily injury liability insurance policies and bonds applicable to the person or persons legally responsible for such damages and available to cover the **insured's** damages.

The majority concluded that Shelter's policy did not require Ploen to exhaust the tort-feasor's liability policy to assert a claim for underinsured motorist benefits. The majority reached the correct conclusion, yet failed to determine exactly how the provision operates or to identify the ambiguity in the provision.

For example, in *Gust v. Otto*, 147 Wis. 2d 560, 433 N.W.2d 286 (Wis. App. 1988), the Wisconsin Court of Appeals addressed an underinsured motorist provision with language virtually identical to that in Shelter's policy and concluded the provision in question was a reduction clause rather than an exhaustion clause. The provision in *Gust* provided:

> "The company will pay all sums . . . because of bodily injury . . . provided

> "(1) that the limits of liability for Underinsured Motorists coverage shall be reduced by the total limits of all Bodily Injury Liability insurance policies applicable to the person or persons legally responsible for such damages;

> "(2) that the company's obligation hereunder shall apply only to such damages that are in excess of the total limits of all Bodily Injury Liability insurance policies applicable to the person or persons legally responsible for

such damages and available to cover the insured's damages . . . ."

*Gust*, 147 Wis. 2d at 563-64, 433 N.W.2d at 287.

The issue on appeal was whether the underinsured motorist coverage began at the level of the insured's *underlying recovery* or at the level of the major liability carrier's *policy limit*. The court initially stated that, when read together, subparagraphs (1) and (2) create an ambiguity which must be construed against the insurer. Subparagraph (1) reduces the insurer's underinsured motorist coverage by the total limits of all bodily injury insurance policies. Subparagraph (2), however, reduces the insurer's underinsured motorist coverage by the total limits of all bodily injury insurance policies and the damages available to cover the insured's damages. Thus, the court determined that subparagraph (2) qualified subparagraph (1) by limiting the reduction to the insured's damages, be it the policy limit or an amount available to cover the insured's damages.

In *Gust*, Verlyn Otto, while driving with a passenger, struck an oncoming car containing Harold Gust, Gust's wife, and the Newmier family. Otto, who was found 100 percent negligent, had a $300,000 liability insurance policy. All claims for the Gusts and Newmiers totaled $479,000. Their total recovery from Otto's insurer was $248,184, the remaining portion of Otto's $300,000 liability coverage being paid to Otto's passenger. The insurer contended that coverage began at Otto's policy limit of $300,000. The Gusts contended that coverage began with the underlying recovery of $248,184. The court determined the amount available for the insured's damages did not amount to Otto's policy limit of $300,000, but, rather, the underlying recovery of $248,184. The court found that the insurer was entitled to reduce the underinsured motorist coverage only by the portion of the total bodily injury limit specifically available to cover the insured's damages. The court reasoned that the insurer's interpretation would allow insurance companies to benefit from a credit not received by the insured. As such, the court held that subparagraph (2) established the scope of the insurer's reducing clause, and thus, the insurer could reduce its coverage by the amount of the insured's underlying recovery, $248,184.

Based on the ruling in *Gust, supra,* and the factually similar situations, the majority in the instant case correctly determined Shelter's policy did not contain an exhaustion clause. However, the majority failed to address exactly how Shelter's provision operates or to identify the ambiguity in the clauses. Therefore, I concur in the majority's conclusion, but not the rationale.

Union's provision stated, "We will pay under this coverage only after the limits of liability under *any applicable* bodily injury liability bonds or policies have been exhausted by payment of judgments or settlements." (Emphasis supplied.) The majority determined the exhaustion clause was consistent with public policy and, thus, valid and enforceable. In turn, the majority affirmed the district court's grant of summary judgment and did not consider whether Ploen's settlement with the tort-feasor adversely affected Union's rights under the policy. However, I dissent because Union's exhaustion clause (1) contains an ambiguity and (2) is inconsistent with public policy.

The phrase "any applicable" in Union's policy is ambiguous. For example, in *Tate v. Secura Ins.,* 587 N.E.2d 665, 669 (Ind. 1992), the Indiana Supreme Court addressed an underinsured motorist coverage clause which provided coverage would occur " 'only after the limits of liability under *any applicable* bodily injury liability bonds or policies have been exhausted by payment or judgments or settlements.' " (Emphasis in original.) The insurer interpreted the clause to refer to all potential policies that may be alleged, and, as such, the insured failed to satisfy the policy language if the insured did not assert claims against every possible liability insurance policy applicable. The court rejected this interpretation and stated, "The phrase 'any applicable' in the exhaustion provision is at best ambiguous." *Tate,* 587 N.E.2d at 669. The court construed the ambiguous phrase against the insurer and determined the phrase meant only one policy providing bodily injury liability coverage for a tort-feasor from whom the policyholder may be legally entitled to recover.

In interpreting a contract, a court must first determine, as a matter of law, whether the contract is ambiguous. *Moller v. State Farm Mut. Auto. Ins. Co.,* 252 Neb. 722, 566 N.W.2d 382 (1997). When confronted with ambiguous language, this court has stated:

Insurance companies in drafting their policies formulate language which may either prevent or create ambiguity. In such draftsmanship, precision provides certainty, while the absence of articulation accounts for ambiguity. As expressed in *Peony Park v. Security Ins. Co.*, 137 Neb. 504, 508, 289 N.W. 848, 851 (1940): "It is consistent with both reason and justice that any fair doubt as to the meaning of the words of a policy should be resolved against the one who prepares it, for if the terms of a policy are capable of two meanings, that is, where the true meaning is doubtful, the law favors such construction as will protect the insured, and not avoid the policy." See *Farm Bureau Ins. Co. v. Pedlow*, 3 Mich. App. 478, 142 N.W.2d 877 (1966).

*Denis v. Woodmen Acc. & Life Co.*, 214 Neb. 495, 498, 334 N.W.2d 463, 465 (1983). In the instant case, Union's exhaustion clause contains the same ambiguous phrase as that found in *Tate, supra*; yet, the majority failed to determine the phrase was ambiguous or to construe the provision against the drafting party. See, *Moller, supra*; *Denis, supra*. Moreover, as also witnessed in *Tate, supra*, we have multiple insurance policies which the underinsured motorist coverage carrier, Union, could allege must be exhausted before the insured, Ploen, satisfies the underinsured policy language. As a consequence, Union could argue that both Keller's policy with American Family Insurance Company and Ploen's father's policy with Union must have been exhausted before Ploen satisfies the underinsured policy language. However, the majority failed to address this ambiguity, and Union is now obligated to pay Ploen and/or any other person carrying Union insurance "only after the limits of liability under *any applicable* bodily injury liability bonds or policies have been exhausted . . . ." (Emphasis supplied.)

Union's exhaustion clause is also void as against public policy. Those states that have held exhaustion provisions to be valid and enforceable have done so based on statutory authority. See, Connecticut Gen. Stat. § 38a-336 (1992); Kentucky Rev. Stat. Ann. § 304.39-320 (Michie 1996); S.D. Codified Laws § 58-11-9 (Michie 1996). The majority in *Ploen* relied on a Connecticut case, *Ciarelli v. Commercial Union Ins. Cos.*, 234

Conn. 807, 663 A.2d 377 (1995), but failed to mention Connecticut's controlling statute. The majority of other courts who have addressed this issue have ruled that exhaustion clauses are void as against public policy. See, *Leal v. Northwestern Nat. County Mut.*, 846 S.W.2d 576 (Tex. App. 1993); *Brown v. USAA Cas. Ins. Co.*, 17 Kan. App. 2d 547, 840 P.2d 1203 (1992); *Shaw v. Continental Ins. Co.*, 108 Nev. 928, 840 P.2d 592 (1992); *Mann v. Farmers Insurance Exchange*, 108 Nev. 648, 836 P.2d 620 (1992); *Matter of Estate of Rucker*, 442 N.W.2d 113 (Iowa 1989); *Mulholland v. State Farm Auto. Ins.*, 171 Ill. App. 3d 600, 527 N.E.2d 29 (1988); *Longworth v. Van Houten*, 223 N.J. Super. 174, 538 A.2d 414 (1988); *Bogan v. Progressive Cas. Ins. Co.*, 36 Ohio St. 3d 22, 521 N.E.2d 447 (1988), *modified on other grounds*, *McDonald v. Republic-Franklin Ins. Co.*, 45 Ohio St. 3d 27, 543 N.E.2d 456 (1989); *Aetna Cas. & Sur. Co. v. Farrell*, 855 F.2d 146 (3d Cir. 1988); *Hamilton v. Farmers Insurance*, 107 Wash. 2d 721, 733 P.2d 213 (1987); *Schmidt v. Clothier*, 338 N.W.2d 256 (Minn. 1983), *superseded by statute*, *Onasch v. Auto-Owners Ins. Co.*, 444 N.W.2d 587 (Minn. App. 1989); *Weinstein v. Am. Mut. Ins. Co. of Boston*, 376 So. 2d 1219 (Fla. App. 1979). Cf., *Cobb v. Benjamin*, 325 S.C. 573, 482 S.E.2d 589 (S.C. App. 1997); *Boyle v. Erie Ins. Co.*, 441 Pa. Super. 103, 656 A.2d 941 (1995); *Adkinson v. State Farm Mut. Auto. Ins. Co.*, 856 F. Supp. 637 (M.D. Ala. 1994); *Buzzard v. Farmers Ins. Co., Inc.*, 824 P.2d 1105 (Okla. 1991); *Vogt v. Schroeder*, 129 Wis. 2d 3, 383 N.W.2d 876 (1986). See, also, 3 Alan I. Widiss, Uninsured and Underinsured Motorist Insurance § 44.2 (2d ed. 1997 Supp.). For example, the Ohio Supreme Court observed:

There are of course a number of considerations which militate in favor of settlement between the underinsured tortfeasor's insurer and the injured party. Obviously, settlement avoids litigation with its attendant expenses and resultant burden upon the legal system. Where the amount of settlement is less than the policy limits, the unpaid amount may well represent the savings in litigation costs for both sides. More importantly, settlement hastens the payment to the injured party who obviously needs compensation soon after the injuries when the medical

> expenses begin to amass and when the anxiety level is probably quite high. Additionally, there are many situations where litigation would not be a preferred course of action because, while the injuries are certain, there may remain other problems of proof. Thus, the public policy considerations, apart from the contract of the parties, generally favor settlements.

*Bogan*, 36 Ohio St. 3d at 25-26, 521 N.E.2d at 451. Similarly, the Nevada Supreme Court determined that exhaustion clauses violate public policy because

> they unnecessarily promote litigation costs, increase the number of trials, and unreasonably delay the recovery of underinsured motorist benefits. Specifically, these cases point out that an insured may have valid reasons for accepting less than the tortfeasor's policy limit, that an "underinsured motorist carrier" can compute its payments to the insured as if the insured *had* exhausted the tortfeasor's policy limit, and that if an "exhaustion clause" is in effect, the tortfeasor's carrier can force the plaintiff to go to trial by offering less than the tortfeasor's policy limit, thereby greatly increasing litigation costs and expenses and promoting delay.

(Emphasis in original.) *Mann*, 108 Nev. at 650, 836 P.2d at 621. However, the majority of the aforementioned authorities have noted that the insurers had notice of the settlement negotiations and that the underinsurance coverage started at the limits of the tort-feasor's liability coverage, not the settlement amount. See Neb. Rev. Stat. § 44-6412 (Cum. Supp. 1996) (newly amended Nebraska consent-to-settle statute). Nonetheless, neither issue affects the outcome of the instant case because Ploen gave Union notice of the settlement negotiations and the majority denied Ploen underinsurance coverage before reaching the issue of the amount of coverage.

In *Augustine v. Simonson*, 940 P.2d 116 (Mont. 1997), the Montana Supreme Court addressed a situation with fact and reasoning nearly identical to those in *Ploen* and ruled that the exhaustion clause was against public policy. In *Augustine*, Susan Simonson collided with Travis Gray's automobile. Tracy Augustine, Chase Augustine, and Cole Davison were passen-

gers in Gray's vehicle. Simonson was insured, with an aggregate combined single limit of $100,000. Gray settled for $20,000, Tracy Augustine settled for $16,875, Chase Augustine settled for $16,875, and approximately $1,100 was paid for property damage. As such, with one potential claim outstanding, approximately $54,600 had been paid out and approximately $45,400 remained. The Augustines then sought to obtain the remaining damages from their underinsured motorist carrier, Farmers Insurance Exchange. Farmers denied the Augustines' claim and alleged the Augustines failed to comply with the exhaustion clause by entering into settlements for less than the tort-feasor's policy limits. The exhaustion clause provided: " 'We will pay under this coverage only after the limits of liability under any applicable **bodily injury** liability bonds or policies have been exhausted by payment of judgments or settlements.' " (Emphasis in original.) *Augustine,* 940 P.2d at 119. At trial, the district court recognized public policy reasons for invalidating exhaustion clauses but declined to hold the clause invalid because " 'it would be unwise to encroach on the legislative function in this area.' " *Id.* at 118.

On appeal, the Montana Supreme Court initially determined the exhaustion clause required the insured to entirely exhaust the limits of all existing bodily injury liability bonds or policies before proceeding against the underinsured motorist carrier. The Montana Supreme Court overruled the district court's judgment, noting the general purpose of underinsurance and specifically the aforementioned passages from *Bogan, supra,* and *Mann, supra.* The court stated that the holding in *Bogan* was consistent with Montana public policy; the purpose of underinsurance, to provide indemnification for accident victims when the tort-feasor does not provide adequate indemnification; and the declared public policy of encouraging settlement and avoiding unnecessary litigation. Therefore, the court concluded the exhaustion provision was contrary to public policy and unenforceable to the extent the provision violates public policy.

This court has stated that the purpose of underinsured motorist insurance is to "provide a means to make the victims of less than adequately insured motorists whole, or as nearly so as reasonably possible . . . ." *Muller v. Tri-State Ins. Co.,* 252

Neb. 1, 8, 560 N.W.2d 130, 135-36 (1997). We have also recognized that settlements are looked upon with favor. See *Delicious Foods Co. v. Millard Warehouse*, 244 Neb. 449, 507 N.W.2d 631 (1993). Moreover, Neb. Rev. Stat. § 44-6409 (Supp. 1997), although not yet effective at the date of trial, provides that "[t]he maximum liability of the insurer under the . . . underinsured motorist coverage shall be the amount of damages for bodily injury . . . sustained by the insured less the amount *paid* to the insured . . . ." (Emphasis supplied.) The language in § 44-6409 contradicts the notion that exhaustion clauses are consistent with Nebraska public policy. Considering the stated purpose of underinsured motorist coverage, the general tenor toward settlements, and the greater weight of authority, Union's exhaustion clause should have been found void as against public policy. I dissent.

GERRARD, J., concurring in part, and in part dissenting.

I join that portion of Chief Justice White's dissent concluding that the exhaustion clause in the underinsured motorist section of Union's insurance contract is void as against public policy. Such a clause that requires entire exhaustion of a tort-feasor's liability insurance as a prerequisite to asserting an underinsured motorist claim is contrary to sound public policy for the reasons set forth in the Chief Justice's dissent. This is particularly true when, as here, the injured party seeks only the difference between the tort-feasor's liability policy limit and the damages sustained by the injured party.

In all other respects, I concur in the opinion of the court.

McCORMACK, J., joins in this concurrence and dissent.